8 So.2d 422

**WILSON v. STATE.**

1 Div. 157.

Supreme Court of Alabama.

May 14, 1942.

4

C. L. Hybart, of Monroeville, Frank G. Horne, of Atmore, and Chas. Arendall, Jr., of Mobile, for appellant.

Thos. S. Lawson, Atty. Gen., and John O. Harris, Asst. Atty. Gen., for the State.

**THOMAS, Justice.**

The indictment and conviction were for murder under counts 1 and 4.

Demurrer to the indictment challenged the sufficiency of counts 2 and 3 in that the death was charged to have been caused by administering to him a quantity of poison.

The third, ground of demurrer pointed out that said counts do not set forth, with the certainty required by law, the means used by the defendant in killing the deceased. The 4th, 5th and 8th grounds of demurrer charge that it is not shown with the certainty required by law the name or kind of poison that defendant administered to the deceased. The demurrer was overruled.

■ At common law the averment of the means by which the offense charged was committed was necessary to a sufficient indictment for murder or manslaughter. The form of indictment prescribed by the statute for murder requires an averment of the means with which the offense was committed. These forms of indictment provide for an averment of the means with which the offense was committed or that the same are unknown to the grand jury. Without such averments, indictments have been held to be defective and subject to appropriate demurrer. The subject of murder is embraced in Code 1940, T. 14, § 314 et seq.; and forms of indictment required in felonies in T. 15, § 259, forms 75, 79, 80 and 81.

The requirement for indictments are indicated in Hornsby v. State, 94 Ala. 55, 10 So. 522, 525. Therein it is stated: "The indictment must be examined, under the rules of the common law, as if it contained two counts; the first charging that the offense was committed by stabbing with a knife, and the second by stabbing with a weapon. The first count undoubtedly would be sufficient. Is there such a description of the means in the second as to make it a good count? At common law it was necessary to set forth in an indictment for murder the means by which the offense was committed; and, if by a weapon, it was necessary to say what the weapon was, or allege it to be unknown to the grand jury. 2 Bish.Crim.Proc. § 514; 1 East, P.C. 341. * * *. We hold that the alternative averment 'or other weapon' insufficiently describes the means used, and rendered the indictment demurrable."

See, also, Canty v. State, 238 Ala. 384, 191 So. 260.

In Westmoreland v. United States, 155 U.S. 545, 15 S.Ct. 243, 245, 39 L.Ed. 255, which involved the sufficiency of the indictment in which it was alleged that the defendant killed the deceased by administering poison, Mr. Justice Brewer said: "At common law, though it was necessary to allege the kind of poison administered, nevertheless proof of the use of a different kind of poison was regarded as an immaterial variance. * * *"

■ The requirements of the common law as to averments of the means by which a homicide is committed has been retained under our procedure. See Code 1940, T. 15, §§ 241, 242; Nordan v. State, 143 Ala. 13, 18, 39 So. 406.

As Counts 2 and 3 were charged out by the court, we need give no consideration to the rulings on these counts.

■ The court's refusal to sustain the challenge of the defendant to the juror Robert E. Wigham on the ground that he was disqualified to serve as a juror is urged for reversal because he was interested as a policyholder in the Southern Life & Health Insurance Company of Birmingham, Alabama, the same company in which deceased was insured, and defendant was made beneficiary under said policy. A juror's disqualification may be raised by a due challenge to the venire or by an objection to striking from the list of jurors furnished the defendant and from which

the jury was to be selected, using the required method of striking the name from said list of jurors.

■■ It is a fundamental rule that a juror should be impartial between the parties. Stinson v. State, 223 Ala. 327, 135 So. 571. In criminal trials great care should be exercised to preserve to accused his constitutional right to a fair trial by an impartial jury. In such cases the court should resolve any doubt as to the competency of a juror in favor of the defendant. In Calhoun County v. Watson, 152 Ala. 554, 44 So. 702, the suit was against the county to recover ex officio services by the clerk of the circuit court, and challenges were sustained to jurors in the employ of the county commissioners. The fact that the jurors excused by the court were employed by the county commissioners may be but "slight incentive to bias, yet it was the action of the commissioners" that was being assailed by the suit.

■■ It is declared that it is well settled that the parties plaintiff in civil actions on proper and seasonable motion are entitled to have the jurors from whom the trial jury is to be selected qualified as to their relation to, or interest in any insurance company, which would be liable in whole or in part for any judgment that might be rendered against the defendant. Sovereign Camp, W. O. W. v. Ward, 196 Ala. 327, 330, 71 So. 404; International Harvester Co. v. Williams, 222 Ala. 589, 133 So. 270; Gammill v. Culverhouse, 217 Ala. 65, 66, 114 So. 800; Citizens' Light, Heat & Power Co. v. Lee, 182 Ala. 561, 62 So. 199. It stands with reason that in criminal cases, where a person's life or liberty cannot be determined by a pecuniary value, the rule should be carefully observed relative to such qualifications of jurors, so that there will be no bias or prejudice and that the jurors selected may approach their duties and reach their conclusions in a fair and impartial manner. A juror to be impartial must, to use the language of Lord Coke, "be indifferent as he stands unsworn." Reynolds v. United States, 98 U.S. 145, 154, 25 L.Ed. 244.

■ On examination of the cases cited above, it will be noted that the Sovereign Camp, W. O. W., v. Ward, supra, litigation was an inquiry as to a mutual insurance company, where the several members and parties insured were required to contribute or were subject to liability as to a sustained financial loss. The Southern Life and Health Insurance Company of Birmingham, in which the juror Wigham had a policy, as well as deceased in which defendant was beneficiary, is an old line company or such that each policy stands for its liability in the required reserve. The juror Wigham had no asset as a policyholder, therefore, that would be affected by or become a liability to his judgment by reason of a verdict that might be rendered in the criminal case for trial. The refusal of the trial court to sustain the challenge of the defendant as to such juror was without error.

The record discloses that after Mr. Wilson took to his bed in March, 1941, he continued so confined until his death, which was on the 27th day of April, 1941, according to the evidence of Dr. J. J. Peterson and other testimony in the case.

Dr. H. S. J. Walker, a practicing physician and surgeon and Coroner of Mobile County, testified that he saw the deceased on the 28th of April, 1941, in the afternoon, at the Higgins' Mortuary in Mobile, after he had been dead practically ten hours, and he examined the body. As to the burns described, he declared them to be the cause of Mr. Wilson's death. The witness said he had first, second and third degree burns covering portions of his face, his neck, his arms and his chest down to about the nipple line and his back down to just about the angle of the shoulder blade; that the burns were more than marked on his chest and on portions of his arms and neck; that his hair was singed partly off and probably had first degree burns on the scalp in spots, and that his arms were burned all the way down to the finger tips, first and second degree burns; that his lips and around his mouth were not severely burned, but there were first degree burns there; that his forehead had a second degree burn and his neck one or two spots of third degree burns.

■ W. H. Newman testified that he was a graduate of an accredited school of medicine; had been engaged in practice of medicine and surgery and was engaged as an intern at the City Hospital in Mobile; that he had no license or certificate to practice medicine from any State Board. He testified that he had passed the Louisiana State Board, but that they didn't give him a license; that he was at the City Hospital in Mobile at the time they brought Mr. Wilson there and he described the burns and stated that he administered morphine; that a record of the hospital showed it was about 4:50 o'clock Sunday afternoon when deceased was admitted to the hospital. The

solicitor asked the witness: "In your opinion, from what you have observed, what caused his death?" The defendant objected to the question on the ground that the witness had not been shown to be competent or qualified to give an opinion on such question. The court overruled the objection and the defendant duly excepted. The answer was: "I think it was due to the extent of his burns at the time."

The basis for the objection was that the record disclosed that the witness had no license or certificate to authorize him to practice medicine and surgery, and, consequently, was unauthorized to express an opinion. In this action of the trial court, there was no error. In Odom v. State, 174 Ala. 4, 7, 56 So. 913, 914, 915, it is said:

"* * * As a general rule, only medical men—that is, persons licensed by law to practice the profession of medicine—can testify as experts on the question of insanity; and the propriety of this general limitation is too patent to permit of discussion. See Tullis v. Kidd, 12 Ala. 648; 12 A. & E. Ency. Law, 452.

"An exception may perhaps be recognized where the witness has made a protracted and systematic study of mental science and disease under approved conditions, as in Re Toomes' Estate, 54 Cal. 509, 35 Am.Rep. 83. In any case, the competency of an alleged expert is a question addressed to the sound discretion of the trial judge. Parrish v. State, 139 Ala. 16, 36 So. 1012."

In this ruling the court did not abuse the discretion allowed the trial judge.

Dr. Reneke, duly qualified as an expert, testified that morphine is a sedative and a depressant and where a patient has been severely burned and under shock, it is a dangerous precedent to administer morphine to him; that the administering of morphine in such cases could cause the patient's death; that is, one-fourth or one-eighth grain of morphine, taken into the system, considering the extent of shock, might cause death. It appears that the witness, Newman, administered to Mr. Wilson, who was badly burned and under shock therefrom when he came to the hospital, a quarter of a grain of morphine right away and about two hours later he ordered morphine given by the nurse. According to the testimony of Doctor Reneke the morphine so given was sufficient to cause the death of Wilson.

The question for the jury was the cause of the death of Mr. Wilson, whether by the burns or morphine administered when he came to the hospital under shock from the burns described by the several medical experts and hospital attendants.

In Barfield v. South Highlands Infirmary, et al., 191 Ala. 553, 565, 68 So. 30, 35, Ann. Cas.1916C, 1097, it is declared: "The charts or records kept by the nurses were kept for the information of the attending physician or surgeon. Everything in them was proper for his information. They were duly proved. Defendant had a right to consider them in determining his treatment, and the jury were properly allowed to have these charts before them as part of the evidence in the case, though doubtless they signified little to any but the skilled professional mind."

Among other things to the like effect are the provisions of Code 1940, T. 7, § 415.

The physician had testified that the administration of morphine to the patient was recorded at the hospital. After qualifying as a record clerk in charge of the records of the hospital, kept under her supervision, Miss Florence Unruh was asked by defendant's counsel: "Are the entries on these records made in the regular course of business in the City Hospital?" Further, "Do you know that these records are true and correct?" Objection was made and sustained over defendant's exception. The witness was further asked if she had charge of the records in that hospital as to Mr. William Grover Wilson on April 27 and 28, 1941, and, "Are these records as you found them in the file?" Objection was interposed by the solicitor. Mr. Newman had testified that Miss Unruh was the keeper of records at that hospital and that the records would reflect the quantity of morphine administered to the patient while there. Appellant's counsel insists that the testimony was for the purpose of showing the quantity of morphine and number of shots of same administered to the deceased while he was in the hospital and the time administered. In rejecting this evidence sought to be offered by defendant, there was reversible error. In City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 266, 122 A.L.R. 637, it is observed: "* * * The opinions of physicians, as experts, touching disease and the science of medicine, are, under all the authorities, admissible in evidence. * * *"

See, also, Stoudenmeier v. Williamson, 29 Ala. 558; Code 1940, T. 7, § 415; 26 Amer. Juris. p. 590, § 6.

Witness Radney, the mortician who prepared the body for burial, described the burns from the standpoint of an undertaker.

So much for the testimony of some of the doctors, their helpers, officials in the hospital and the undertaker touching the nature and character of the burns of deceased.

The defendant testified of the location of the several parts of the house. She and other witnesses stated the condition of the room, the arrangement of furniture therein, the parties who resided there, where they slept, and where and how the bed on which Mr. Wilson lay was situated in the room. Mrs. Wilson further testified that her husband's bed was equipped with one mattress, an old quilt, an oil cloth, newspapers over that and a sheet; that the oil cloth was over the mattress and quilt and she covered them with some newspapers. She recounted the physical condition of her husband and his continued illness. The witness further said that on the occasion of his injuries, her husband was propped up on a chair in the bed with pillows at his back and was reading the Saturday and Sunday papers which were scattered all over the bed. When she last saw her husband, he was propped up in the bed, reading the papers and that he was an inveterate smoker during his last illness. Other witness testified to the habit of Mr. Wilson smoking in bed and that there was always a saucer on the bed with a lot of half burned cigarettes and match heads in it. This habit of deceased was verified by other witnesses.

■ Touching the evidence tending to show that the deceased was an inveterate smoker, the state introduced James Leonard Wilson, a brother of deceased, who testified that the latter was not smoking cigarettes while he visited there and he did not remember his smoking "but twice from Monday to Friday" before deceased was burned. The state introduced Miss Johnson, who remembered the occasion when Mr. Wilson died and that his brother purchased from her "two cigarettes;" the "two individual cigarettes, not two packages." Defendant moved to exclude the testimony as irrelevant, incompetent and immaterial, to which the court replied that it was in confirmation of testimony already existing, and overruled the objection. To this ruling the defendant excepted. It is a rule of evidence sanctioned by this court that the testimony of a witness cannot be corroborated by proof of his declarations or acts. In Shamberger v. State, 221 Ala. 538, 539, 130 So. 70, 71, it is declared: "We are constrained to hold that these rulings were error to reverse. In Green v. State, 96 Ala. 29, 11 So. 478, 479, the court said: 'A witness cannot corroborate himself by introducing other witnesses to prove that he made the same statement to them to which he deposed, * * *.'"

To the same effect are Key v. State, 240 Ala. 1, 197 So. 363, and Id., 240 Ala. 19, 197 So. 364.

■ The admission of this corroborating evidence by the state was without injury to the defendant. The wife contended that her husband was a habitual smoker and that his fatal injuries were caused by burns of accidental ignition of papers and bedding from a match which Mr. Wilson used in lighting the cigarettes or from a cigarette that he had been smoking immediately preceding his accident and injury. In this ruling there was no error as it was not a declaration bolstering a witness's statement but a fact which was relevant to the case.

The state introduced Mr. Balthrop as a witness, who testified that he was next door to the Wilsons at the time of the fire; that Nellie Wilson, Smith, Barns and Bubba Wilson were on the front gallery and that Mrs. Wilson was in the back yard at the clothes line; that Nellie Wilson, hearing her father make a noise, went in and found his bed on fire and screamed; that witness looked over and saw a blaze and flare of fire "in a sudden gust," and that he went through an ante room into where Mr. Wilson was doubled up on the foot of the other bed (not on fire) and that his bed was on fire (there being two beds in said room); that Smith had a blanket trying to put the fire out and witness assisted him in that effort.

The witness further testified that when he went into the house he did not see the defendant or her daughter; that a moment later defendant and her daughter were in the ante room, and Mrs. Wilson was being comforted by that daughter. The witness was asked by State's counsel, "Could you tell from what you saw there existing what was burning in that fire when you first saw it?" The witness answered, "You mean exactly what I can tell you was a big blaze and it seemed it had to be fed by something." The defendant objected to

the words, "what it seemed," etc., and moved to exclude that part of the testimony and the court granted this motion. The witness was then asked by state's counsel, "Have you ever noticed a fire created by gasoline," and he answered, "Yes." The state's counsel then asked "Did this fire you saw there in the window have the appearance as a fire that you say you have seen being made with gasoline?" The defendant objected and the objection was sustained. Whereupon the state's counsel asked, "When you first saw that fire I wish you would please describe in detail that blaze there and how it blazed up and how it burned and every detail about it that you saw." Defendant objected, which was overruled, the defendant excepting, and the witness answered, "Well, it was just a big blaze * * * it went up in a hurry. If it was not an artificial fire, it looked like it." The defendant moved to exclude the part of the answer, "it looked like an artificial fire." The court overruled the motion and defendant excepted.

▮▮▮ The rule that obtains in this jurisdiction is that deductions of a non-expert witness should not be permitted to go to the jury relative to matters directly in issue and for the decision of the triers of fact. Carwile v. State, 148 Ala. 576, 585, 39 So. 220, 221.

▮▮▮ In Carney v. State, 79 Ala. 14, Chief Justice Stone dealt with the subject of such opinion evidence where human language has no terms by which it can be dissected and explained in detail. The reason is that the resultant of everyone's experience and observation is stated as to human emotions, passions, physical entities, not susceptible to direct proof. The subject was again discussed in Pollard v. Rogers, 234 Ala. 92, 98, 173 So. 881, where the cases of shorthand rendition of fact are collected. The rule that obtains as to such is stated generally in 69 A.L.R. p. 1168, the rule permitting one to testify as to one's own mental state at a particular time is declared, and authorities from this jurisdiction are collected. It is said: "The prevailing rule to be applied to such inquiries has long since been announced by Judge Stone in South & North Alabama Railroad Co. v. McLendon, 1879, 63 Ala. 266, 276, who said: 'The true line of distinction is this: an *inference, necessarily involving certain facts, may be stated without the facts,* the inference being an equivalent of a specification of the facts: * * *. In other words, when the opinion is the mere short-hand rendering of the facts, then the opinion can be given subject to cross-examination as to the facts on which it is based. Whar.Ev. § 510'." [Italics supplied.]

See Roan v. State, 225 Ala. 428, 143 So. 454; Batson v. Batson, 217 Ala. 450, 117 So. 10; Peters v. State, 240 Ala. 531, 538, 200 So. 404.

▮▮▮ All fires are actual and not artificial. What the witness, no doubt, was trying to describe to the jury was the appearance of the fire as being one fed by gasoline or other chemical or by extraneous means. When so considered, the testimony was prejudicial. However, the answer was within the rule allowing a witness to express his own conclusions from facts which he observed under unusual conditions that obtained and could not be otherwise expressed. In this ruling there was no error.

▮▮▮ The witness Balthrop having testified that he saw the fire stated that he immediately approached the room of deceased through the ante-room; that he did not see Mrs. Wilson and would not say she was not in the ante-room when he passed. The state's counsel asked, "If she had come in there could you have seen her?" There was objection which was overruled and exception reserved by defendant. The witness answered, "I think I could have, yes sir." This question and answer was without error.

A state's witness testified that Mrs. Wilson had him go to the gasoline station the day before and get a bottle of gasoline, saying that she wanted to use it as a disinfectant and in cleaning the floor and furniture. Another witness said that after the fire, the bottle was setting on the floor in the room with a large part of the gasoline used therefrom; the defendant testified she had used some of it from that bottle as a cleansing agent and that she did not use any portion of it in the destruction of her husband.

The witness Smith testified of Nellie's calling the mother, that he went immediately in the room, found Mr. Wilson had crossed the room to the other bed, that Nellie had a blanket in her hands trying to extinguish the fire and he took the blanket and wrapped it around Wilson; that Mrs. Wilson came up the back steps with some

clothes in her hand and he requested her to get a tub of water, which she did; that the bed was burning in spots and Mr. Wilson was on fire from his waist up in front and that he grabbed the blanket and smothered the fire out.

Miss Wilson testified that she left her father after seeing him light a cigarette and went out on the front porch; that there were several on the porch with her; that she went into the room when she heard her father's cries; that the defendant was out in the back yard; that when she went on the porch her mother went out the back. The witness further said that she found the father's bed burning in different spots and that the blaze was not so terribly high; that when she called, her mother came in from the back yard with an arm full of clothes, threw them through the door on a chair, and got a tub of water at the request of Smith.

Willie Jean Barns, a young girl, testified that she was on the front porch; heard Nellie's scream, went in the room, saw Nellie on the davinette by the defendant trying to comfort the mother.

Bubba Wilson testified that he saw his sister go in the room, heard her screams in the room and about five minutes later found Nell in the living room, and she said her Daddy had got burned, and upon being asked if bad, she answered, "Yes." That Nellie and the mother were crying while they sat on the studio couch.

It is contended by appellant's counsel that the corpus delicti as to Mr. Wilson's death from the burns in question was not established.

■ In Ex parte Acree, 63 Ala. 234, Judge Stone said:

"A person charged with a felony should not be convicted on circumstantial evidence alone, unless it excludes to a moral certainty every reasonable hypothesis but that of his guilt; no matter how strong the circumstances may be, they do not come up to the full measure of proof which the law requires, if they can be reconciled with the theory that another person was the guilty agent.

" * * * The humane provisions of the law are, that a prisoner, charged with a felony, should not be convicted on circumstantial evidence, unless it shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires. The constitutional provision on this subject declares, 'That all persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses, when the proof is evident, or the presumption great.'—Const., Art. 1, § 17. * * *"

In Pickens v. State, 115 Ala. 42, 22 So. 551, Chief Justice Brickell quoted the foregoing excerpt from the Acree case, with approval. The same was approved by this court in Cooper v. State, 235 Ala. 523, 180 So. 102. In Bowen v. State, 140 Ala. 65, 37 So. 233, 234, Mr. Justice Sharpe said: "The test of the sufficiency of circumstantial evidence in a criminal case is whether the circumstances, as proven, are capable of explanation upon any reasonable hypothesis consistent with the defendant's innocence, and, if they are capable of such explanation, then the defendant should be acquitted."

It is contended by appellant that it would be more natural or reasonable to suppose that Mr. Wilson was burned by his own act in the use of matches in lighting cigarettes and smoking in bed, through his carelessness, allowing contact with the material, paper, etc., on his bed, "regardless of the other circumstances which appear in the record."

Such other circumstances catalogued by counsel are that the evidence shows the purchase of the bottle of gasoline on Friday before the death of Mr. Wilson and after the fire the same being found in his room with only a small portion of the gasoline therein; that life insurance policies had been procured on the life of the deceased with double indemnity clauses in which the defendant was named as beneficiary, and that she subsequently tried to collect and expend such insurance; the burial and vault insurance policies on the life of the deceased, which were promptly paid by insurer to the widow of Wilson and employed in reduction of expenses of his funeral; and the alleged illicit relations of defendant and Langham.

The evidence for the state further shows that the defendant objected to sending the

deceased to the hospital for treatment for his burns and on the insistence of the doctor this was done; that defendant failed to visit deceased while being treated at the hospital, and that she did not view the body or go to the morgue.

There is other evidence to the effect that defendant inquired of the attending physician shortly before the husband's death whether it was necessary for him to come every day to see the patient. The evidence further shows a failure of the wife to visit the funeral home while the body was there; that chloroform and sodium amytal were administered to the deceased at his request; and the evidence further shows that many bottles of chloroform were purchased and the empty bottles found.

There is evidence of the alleged illicit relationship of Mrs. Wilson and Langham, letters and telegrams to that effect. Evidence was before the jury touching the removal from Wilson's body of vital parts by state or county officials and on due analyses the finding of mercury therein in sufficient quantities to have caused death; further the purchase and use by Mr. Wilson of milk as a food and as an antedote for the malady from which he suffered. Empty bottles of bichloride of mercury were found in the chifforobe drawer of Mrs. Wilson.

The state's evidence further shows an activity on the part of defendant and Langham to secure the latter's release from the United States Army, the activities of defendant and Langham in inspecting and attempting to purchase an automobile and inquiries about a house and the purchase thereof from the insurance money when it was collected.

It would serve no good purpose to go into details of the circumstances pointing to the guilt or innocence of the defendant. They are introduced at great length by counsel. It is insisted by appellant's counsel that it was not unreasonable to suppose, nor an unreasonable assumption, that the death of Mr. Wilson was caused by his own carelessness in the use of matches and cigarettes consumed while in bed or that his death was caused by the witness Newman, intern at the hospital, in the administration of morphine at the time Mr. Wilson was in shock as a result of the burns and while he was a resident at the city hospital a short time before his death.

Adverting to the testimony of Dr. Rehling, he testified that he was connected with the Department of Toxicology of the State of Alabama as Senior Toxicologist; that he received the shipment of Wilson's vital organs from Dr. Grubbs on May 7, 1941; that it contained the viscera, a liver, a tied off stomach and its contents with the attached section of the small intestines, two kidneys, spleen and a portion of material that corresponded to the pancreas and two lungs; that he made a complete toxicological examination for organic poison; that he made a quantitative analysis of one kidney to determine the amount present and from one kidney he was able to isolate 21½ milligrams of metallic poison; from the quantitative test of the other organs indicated relatively large quantities of mercury in the liver and other kidney and spleen. Witness acknowledged that the endeavor to isolate metallic mercury from the kidney as to the amount of the mercury in the other organs was his conclusion, from the amount found in the one kidney of which the test was made and after all was a guess on the part of the toxicologist. The solicitor asked the witness the following question: "What significance, if any, was the fact that you found a quantity of mercury in the kidney you testified about?" The answer was: "The quantity of mercury found in that kidney is extremely large for a human kidney, and it represents more than a fatal quantity had been absorbed by the body." The defendant objected and the court overruled the objection, defendant excepting. The witness was permitted to answer that "Mercury poisoning is a poisoning by a heavy metal poison. The first action is that of a corrosive poisoning; that is, it corrodes the tissues which it comes in contact with, particularly the mucous membranes of the kidneys and the gastrointestinal tract. These are the first symptoms. They are followed in time with absorption, which begins very shortly after it is taken. Mercury is distributed over the body and it is deposited in these various organs—the liver, the spleen and kidneys, in particular; the kidneys make a great effort to get rid of the mercury, hence there is a large accumulation of the mercury in the body of those kidneys. So after several days there is such damage to the kidneys that uremic poisoning results; that is, there is much over production of urine and poison accumulation in the body and in the blood stream particularly and

death follows primarily from uremis poison or the accumulation of such poisons in the blood stream although death may result from the poison shortly after being taken, or up until two or maybe three weeks after sometimes.

The evidence shows the witness was an expert. In the action of the court in overruling the defendant's objection to his answers there was no error.

■ The same witness was further asked: "Are you familiar with the disease designated as Trench Mouth—commonly called trench mouth?"

The defendant objected as the question called for testimony of an expert witness and "this witness is not a medical doctor and not qualified to testify." The court overruled the objection to which defendant excepted and the witness was allowed to answer: "I know of the disease and roughly what its symptoms are." Witness was asked: "Do you know whether or not mercury poisoning will bring about the same condition as trench mouth?" Over the objection of defendant, exception being reserved, the witness was permitted to answer: "The symptoms are very much alike." In this ruling there was no error.

Witness was further asked: "How much bichloride of mercury was represented by the mercury you found in the kidney in which you made reference." Over the defendant's objection, witness answered: "The amount of mercury represented in the body was about seven grains, equivalent to seven grains of bichloride of mercury;" that he did not know how much in excess was administered.

■■ The record further shows that Dr. Peterson administered sodium amytal capsules and that the same did not act very happily with deceased. Mr. Brannon and Dr. Wilson testified to filling that prescription several times, calling for three grain capsules, standard size; and he did know whether the drug was delivered to Mrs. Wilson. The motion by defendant to exclude this testimony was overruled without error.

There is other testimony tending to show that three grain capsules taken in the period of four days could kill. Dr. McVay testified that he didn't prescribe thirty-six three grain amytal capsules for Mr. Wilson and answered over the defendant's objection that it was dangerous for a patient to use in four days 36 capsules of sodium amytal. The exception as to this testimony taken by defendant was properly overruled.

The witness Rehling, who had qualified as an expert, testified of the normal dosage of sodium amytal; that such drug administered around 15 grains up was a poisonous dose. The witness further stated that in such capsules there was a little over 100 grains and that it would be in that length of time (four days) a dangerous quantity to take.

■ It was competent for the state to give in evidence the fact of finding mercury in the body of Mr. Wilson, the finding of empty bichloride of mercury bottles in the chifforobe drawer, together with symptoms of Mr. Wilson's sickness and the purchase and use of more than one bottle of milk per day.

■ It is a rule of this court that expert witnesses may be examined on imaginary and abstract questions in order to test their opinion of the possible theories of the case and the value and accuracy of their opinions expressed. Parrish v. State, 139 Ala. 16, 36 So. 1012; Braham v. State, 143 Ala. 28, 38 So. 919.

■ The witness Langham testified that in September of the year before Wilson died, he had a conversation with him of his physical condition and was asked, "Please state whether or not the deceased told you he was suffering from syphilis?" The solicitor objected and the defendant excepted. The court sustained the objection. Other testimony had shown that the condition brought on by syphilis was similar to that of mercury poisoning and trench mouth. The witness was further asked if Wilson stated that he was suffering from hypodermic shots and the solicitor objected to the question. This objection was sustained. The foregoing sought to present to the jury this testimony for what it was worth as to the induction of mercury into the system of Wilson at the time of, immediately preceding his last illness and death. This evidence should have been admitted at the instance of the defendant. Johnson v. State, 17 Ala. 618.

Defendant introduced as a witness Claude Langham, who testified that the deceased had used iodine, mercurochrome, and that witness told him that it had been burning his mouth. Mrs. Wilson testified that when the deceased went to bed he

attempted for some time to doctor himself with the foregoing drugs, to which Wilson later added vinces, paragoric and chloroform on the inside of the mouth and before he had the doctor. She further said that she saw him taking tiny tablets; that he said the doctor gave them to him. This evidence was supported by that of Miss Wilson, saying that the deceased treated himself about five weeks before he went to the doctor, and at which time his mouth was very raw.

■■■ Mrs. Wilson had testified that her husband had two tests for syphillis, one by Dr. McVay at the Board of Health, and the other by Dr. Sumner. The latter qualified as an expert and said that he took Wilson's blood test and said that Dr. Waites had general charge of said laboratory and supervision of the record of these tests. Defendant asked: "Do you know that those records which you have under your supervision are true and correct?" The state's objection to such question was sustained over the exception of defendant, and to the further questions as, "What do those records show?" and "Is this the original which was made and kept at the Board of Health office?" The witness answered, "Yes." He was then asked by defendant, "What is this record?" To this question there was no ruling of the court. The witness was then asked, "As I understand it, a record of births, deaths and health are kept there under your supervision as a part of the records of the State of Alabama, is that a fact?" Objection was made by the solicitor, and the court stated, "As far as this gentleman's testimony goes he sent blood specimen to the laboratory and that is all that he knows about it." After further colloquy by the court with counsel, the witness was asked: "These records are kept in the usual course of business in the health department or board of health?" The witness answered, "Yes." He was then asked: "Is your department required by law to keep those records?" The solicitor objected to the question and the statute was tendered to the court. The court replied: "I don't see where a blood test is comprehended with the statute, requiring these records to be kept." The court sustained the objection and the defendant duly excepted. In this action of the court there was error. Code 1940, T. 7, § 415.

The foregoing will show the trial of this defendant. There were manifest errors committed that will require a reversal of the cause on the evidence.

It will not be necessary, under the many decisions of this court, to recount further the evidence pro or con, touching the guilt or innocence of this defendant. Davis v. Davis, 241 Ala. 385, 2 So.2d 780; First Nat'l Bank of Opp v. Wise et al., 241 Ala. 481, 3 So.2d 68. We have indicated at the outset that there were incriminating tendencies contained in letters, telegrams and testimony of witnesses as to the alleged relationship between Mrs. Wilson and Langham before, at the time of and after the death of her husband. It would serve no good purpose to incumber the decision with a recitation thereof.

Since the case will have to be retried, we will consider some of the refused charges in order to guide the court on retrial. In the general charge of the court the nature of the indictment was given, eliminating counts two and three thereof, charging the instrument of death as poison. The degrees of murder were defined. The penalty of the law in case of conviction for homicide was stated. The jury was charged that there was no presumption against the defendant from the indictment and the measure of requirement of proof under the issues submitted by the court to the jury was explained. Reasonable doubt was explained, the court saying: "There has been much circumstantial evidence, in fact, most of the case, you might say, if not all of it, has been circumstantial evidence. On that circumstantial evidence gathered together by you from them you shall determine the guilt or innocence of the defendant under the charge under the indictment. And under the law those circumstances must convince you beyond a reasonable doubt of the guilt of the defendant before you can convict."

A circuit judge is entitled to sympathy who is forced to consider such a volume of charges, no doubt, after his general charge was delivered.

The writer will say that the attorney general through his assistant attorney general, Mr. Harris, has given the many refused charges for consideration a painstaking study under our decisions. This has lightened the burden of the court as to the many refused charges, assigned as error.

In Farrish v. State, 63 Ala. 164, Mr. Justice Stone, speaking for the court, said:

"Elementary writers, in speaking of the measure of proof necessary to insure conviction in a criminal case, have frequently said, 'in cases of doubt, it is safer to acquit than to convict or condemn.' * * * This is but the complement of that other maxim, often quoted, and sometimes perverted, 'that it is better that many guilty persons should escape, than that one innocent person should be made to suffer.' Mr. Best, in his excellent treatise on Evidence, section 95, speaking of these maxims, says, they 'are often perverted to justify the acquittal of persons, of whose guilt no reasonable doubt could exist.' He adds: 'There are other maxims which should not be forgotten: "It is the interest of the commonwealth that malefactors do not go unpunished"; and, "He threatens the innocent, who spares the guilty."' The language we are criticising declares a safe and human rule for the guidance of both courts and juries. Neither the law nor the exigencies of society demand or approve the punishment of the innocent, or of the doubtfully guilty. Doubts are resolved in favor of the accused. Juries should never convict, until the fact of guilt is made morally certain by the evidence. This is the mandate of the law, and is the birthright of both the English and the American citizen."

We are brought to a consideration of some of the refused charges of the several classes presented by this trial.

Charge 1 is a correct statement of the law. Smith v. State, 182 Ala. 38, 62 So. 184.

Charges 2 and 17 are supported by Lawman v. State, 207 Ala. 419, 93 So. 69. There was no error in their refusal as said charges were covered by the oral charge.

Charge 3 was approved in Bryant v. State, 116 Ala. 445, 23 So. 40, and was covered in the oral charge.

Charges 4 and 92 were condemned by this court as confusing in Osborn v. State, 125 Ala. 106, 27 So. 758. There was no error in the refusal of the same. The rule of the cases in this and many other jurisdictions is stated in 120 A.L.R. 1445 (3), 1452 Note B.

Charges 5, 6 and 7 were properly refused as argumentative under the authority of Way v. State, 155 Ala. 52, 46 So. 273.

Charges 8 and 10 were correct statements of the law according to the decision in Bowen v. State, 140 Ala. 65, 37 So. 233. It is insisted by the state's counsel that they were covered in the general charge, and we are in accord with this insistence.

Charges 11, 68 and 88 have been approved in Brown v. State, 118 Ala. 111, 23 So. 81; Johnson v. State, 133 Ala. 38, 31 So. 951; Davis v. State, 8 Ala.App. 147, 62 So. 1027; Veasey v. State, 20 Ala. App. 478, 103 So. 67. We are not of opinion that these charges were sufficiently covered by the oral charge.

Charges 14 and 15 find support in Pickens v. State, 115 Ala. 42, 22 So. 551, 554. The words "all the evidence," etc., "was circumstantial," were misleading as applied to the whole evidence in the case. It is observed by Chief Justice Brickell, as follows: " * * * The test of the sufficiency of circumstantial evidence is whether the circumstances, as proved, produce a moral conviction, to the exclusion of all reasonable doubt, of the guilt of accused,—whether they are incapable of explanation upon any reasonable hypothesis consistent with his innocence. In Ex parte Acree, 63 Ala. 234, the principle, as it may be collected from approved text writers and the current judicial decision, was announced by Stone, J.: 'The humane provision of the law is that upon circumstantial evidence there should not be a conviction unless, to a moral certainty it excludes every other reasonable hypothesis than that of the guilt of the accused. No matter how strong may be the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the guilt of the accused is not shown by that full measure of proof the law requires.' * * *"

Charge 67 is to like effect of charge 7, considered in McCoy v. State, 170 Ala. 10, 14, 54 So. 428, 429. Mr. Justice Sayre therein observed: "Charge 7 employs the words in the same sequence of a charge which had approval in Gilmore v. State, 99 Ala. 154, 13 So. 536, but with a difference in respect to punctuation and division into sentences, which, to say the least, impairs the clearness of the idea intended to be expressed. The charge there was approved as proper in the case of an indictment for burglary, and what has been

already said of charge 2 may be repeated as applicable to the use of its first clause in the case here. In the recent case of Bailey v. State [168 Ala. 4], 53 So. 296 [390], where burglary and larceny were charged, the same words were used again in the same sequence, but all in one sentence. * * *"

The charge should not have been given.

Charges 16 and 33 correctly state the law and should have been given. Alabama Steel & Wire Co. v. Griffin, 149 Ala. 423, 42 So. 1034; McClellan v. State, 117 Ala. 140, 23 So. 653.

Charges 19 to 28, inclusive, were properly refused as containing misleading tendencies in respect to testimony of expert witnesses given the jury in the oral charge of the court. Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524; United States v. Goodloe et al., 204 Ala. 484, 86 So. 546. While the jury is not concluded by the opinion given by experts, it is the province of such triers of fact to measure the weight and correctness of opinions given by experts. Braham v. State, 143 Ala. 28, 38 So. 919.

In Ex parte Davis et al., 184 Ala. 26, 63 So. 1010, charges to the effect of 29 and 54 were condemned and the refusal of such charges was not error. McDowell v. State, 238 Ala. 101, 189 So. 183.

Charges 31 and 56 are to the effect that if after a full consideration of all of the evidence the guilt of the defendant is not proven to a moral certainty, then the jury must find the defendant not guilty. These charges are supported by Griffin v. State, 150 Ala. 49, 43 So. 197. Such instruction was contained in the oral charge of the court, and the refusal was not error to reverse.

Charges 32 and 81 were not the same as charges approved in Leonard v. State, 150 Ala. 89, 43 So. 214; Henderson v. State, 11 Ala.App. 37, 44, 65 So. 721; Hale v. State, 122 Ala. 85, 89, 26 So. 236. These charges have a tendency to convey the idea that a jury may entertain a reasonable doubt without consultation with the other jurors and were properly refused. Holmes v. State, 136 Ala. 80, 34 So. 180. So also, Charge 30 has a like tendency and was properly refused.

The court was justified in refusing to give Charge 34 because of the omission of the word "false" as to any material part of the testimony in defining testimony maliciously and willfully given and to be considered by the jury.

Charge 39 is as follows: "The court charges the jury that before the jury can convict the defendant they must be satisfied, to a moral certainty, not only that the proof is consistent with the defendant's guilt, but that it is wholly inconsistent with every other rational conclusion; and unless the jury are so convinced by the evidence of the defendant's guilt that they would each venture to act upon that decision in matters of the highest concern and importance to his own interest, then they must find the defendant not guilty."

Such instruction was the same as Charge 8 which is condemned in Leonard v. State, 150 Ala. 89, 43 So. 214; Watkins v. State, 133 Ala. 88, 92, 32 So. 627; Amos v. State, 123 Ala. 50, 54, 26 So. 524; Rogers v. State, 117 Ala. 9, 22 So. 666; 5 Mayfield's Digest, p. 140, § 264.

Charge 40 is as follows: "The court charges the jury that if evidence of good character has been introduced you may consider the same in connection with all of the evidence in the case, and *if it generates* within your mind a reasonable doubt as to the guilt of the defendant, it is your duty to acquit the defendant." [Italics supplied.]

Said charge was properly refused. In Scott v. State, 133 Ala. 112, 32 So. 623, 624, it is declared: "Good character of the defendant may be considered in connection with all the other evidence in the case, and when thus considered, may generate a reasonable doubt of his guilt, when the other evidence without it might leave no such doubt; but it is improper to charge the jury that good character alone, without its consideration in connection with the other evidence in the case, may be considered to generate a reasonable doubt of guilt. Miller v. State, 107 Ala. [40], 59, 19 So. 37; * * *."

The charge may be refused on the further ground that it submits to the jury the fact of whether such evidence of good character has been introduced. This was a question for the court.

As to evidence on good character we refer to 10 A.L.R. p. 30, Note on p.

106, where all the Alabama cases are collected.

The court instructed the jury as follows: "There has been much circumstantial evidence, in fact, most of the case, you might say, if not all of it, has been circumstantial evidence. On that circumstantial evidence gathered together by you from them you shall determine the guilt or innocence of the defendant under the charge under the indictment. And under the law those circumstances must convince you beyond a reasonable doubt of the guilt of the defendant before you can convict."

Written charge 55 was requested and is in the following language: "The Court charges the jury that unless each of you is convinced beyond a reasonable doubt of the guilt of the defendant, from the evidence in the case, then, you should not convict her."

In Carter et al. v. State, 103 Ala. 93, 15 So. 893, it was held that the conclusion of all the jurors is essential to a fact, and in a criminal case, it is error to refuse to instruct the jury that each juror must be convinced of defendant's guilt beyond a reasonable doubt before they can convict. Morrison et al. v. Clark, 196 Ala. 670, 72 So. 305; Birmingham R. L. & P. Co. v. Goldstein, 181 Ala. 517, 61 So. 281; and in Coleman v. Adkins, 232 Ala. 351, 168 So. 184, Mr. Justice Bouldin made the distinction between charges like that under consideration "directing a verdict" for defendant and charges to the effect that without unanimity of the jury a verdict of conviction may not be rendered. And in the Morrison case, supra, 196 Ala. page 678, 72 So. 308, it is said: " * * * defendants sought to have the jury instructed to find for the defendants, if the mind of any one juror was in a state of doubt or uncertainty. This fact might have warranted a mistrial, but not a verdict for the defendants. * * *"

The charge should have been given and was not covered by the oral charge.

■ Charges 12 and 46 are identical and are as follows: "The Court charges the jury that if the evidence of the state consists in the statement of *a witness*, of the truth of which the jury has reasonable doubt, they cannot convict on such evidence, although they may not believe the testimony of defendant's witnesses." [Italics supplied.]

In Segars v. State, 86 Ala. 59, 5 So. 558, 559, it is observed: "On this state of the evidence the defendant requested the court to instruct the jury that, if the evidence of the state consists in the statements of a witness, of the truth of which the jury have a reasonable doubt, they cannot convict on such evidence, although they may not believe the testimony of defendant's witness. * * * The jury are not authorized to find the defendant guilty on the evidence of a single witness, upon whose testimony the question of guilt depends, if they have a reasonable doubt of the truth of his statements. Washington v. State, 58 Ala. 355. The evidence on the part of the defendant being wholly exculpatory, the effect of refusing the charge is to shift the burden of proof, on a prima facie case of guilt being made by the prosecution."

This charge (12) has been frequently adverted to. Love v. State, 218 Ala. 66, 117 So. 400; Hurston v. State, 235 Ala. 213, 178 So. 223; Ivory v. State, 237 Ala. 344, 186 So. 460. In the decision last adverted to it is indicated that the state's witnesses and evidence consisted not only of the testimony of state witnesses, but a detailed conversation of defendant. Hence the charge was unlike that dealt with in Segars v. State, supra. In the instant case the state's witnesses were many and not the statement of "a witness." Therefore, there was no error in the refusal of said charges. Judge Samford made this distinction in Slayton v. State, 27 Ala.App. 422, 429, 173 So. 632.

■ Charges 51 (our mark 51–A) and 53 are to like effect and should have been given. On another trial this should be done. Brown v. State, 118 Ala. 111, 23 So. 81; Bryant v. State, 116 Ala. 445, 23 So. 40.

Charges similar to 91 have been approved by this court. Bryant v. State, 116 Ala. 445, 23 So. 40; Miller v. State, 107 Ala. 40, 59, 19 So. 37. Charge 91 was covered in the oral charge.

■ The defendant's right to request certain written charges under Code 1940, T. 7, § 273, has been properly appreciated in McKenzie v. State, 19 Ala.App. 319, 321, 97 So. 155, 157. We quote: " * * * It is true the court in his oral charge had instructed the jury correctly on the general law of reasonable doubt and had given several written charges defining in general

terms a reasonable doubt, but none of these charges given by the court were in the language of, or substantially covered the phase of, the evidence sought to be impressed upon the jury by this charge refused by the court. Charges moved for by either party must be in writing and must be given or refused in the terms in which they are written. * * *"

■ We note as to the presumption, as for example that against suicide, that it is not a mere legal formula levied to safeguard against the unqualified conviction of a person as is the presumption of innocence in a criminal trial. That presumption of innocence, while it persists throughout the trial, is not based on a human instinct, but is a humane theory and persists because that is a feature of the theory. 22 Corpus Juris Secundum, § 581, p. 894.

■ Charge 84 refused by the court is as follows: "The Court charges the jury that the legal presumption of innocence is to be regarded by the jury in every case as a matter of evidence, to the benefit of which the accused is entitled, and, as a matter of evidence, it attends the accused until his guilt is, by the evidence placed beyond a reasonable doubt."

This charge and other charges to like import should have been given. Bryant v. State, 116 Ala. 445, 446, 23 So. 40; Mutual Life Ins. Co. of New York v. Maddox, 221 Ala. 292, 128 So. 383. See later decisions by the United States Supreme Court in New York Life Ins. Co. v. Gamer 303 U.S. 161, 58 S.Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218, on presumption.

■ The character of the fire, the manner of its burning as described by the witnesses; the damages as shown to the upper part of the body of the deceased and that of failure to show injury to the lower part of the body; the bottle of gasoline substantially used when taken in connection with the position of the body—all the other evidence included, make up the corpus delicti. Black's Law Dic. p. 280.

■ It would serve no useful purpose to consider all the refused charges. We conclude the subject by the observation that charges 41, 44, 45 and 60 were refused by the court without error as being misleading and confusing. Reeder v. State, 210 Ala. 114, 97 So. 73; McDowell v. State, 238 Ala. 101, 189 So. 183.

■ In 23 Corpus Juris Secundum, § 1282, pages 850 and 851, charges of the character under consideration are discussed in detail and the authorities pro and con from this jurisdiction and from the Court of Appeals are collected. As we understand it, the better rule expressed and obtaining is that the jury should acquit if there is from the evidence a probability of innocence, and such charge is generally held proper. However, such instruction is not properly given when not predicated on the evidence in the case under discussion.

The trial court instructed the jury on the burden of proof as follows: "* * * the measure of proof required, and I want you to listen carefully, the State must satisfy you by strong and cogent and convincing evidence to a moral certainty and beyond a reasonable doubt of the guilt of the defendant. If there is a probability of the innocence of the defendant arising out of the evidence, she is entitled to that consideration, however strong the circumstantial evidence or direct evidence may be. The measure of proof is that you must be satisfied from the evidence, beyond all reasonable doubt, of the truth of the allegations of the indictment. * * *."

There were manifest errors committed on the trial of this case, as we have indicated in some detail. For these errors, the judgment of the circuit court should be, and it is hereby, reversed and the cause remanded.

Reversed and remanded.

GARDNER, C. J., and BROWN and FOSTER, JJ., concur.