179 So.2d 170

James TURNER

v.

STATE.

8 Div. 2.

Court of Appeals of Alabama.

Oct. 13, 1965.

- David U. Patton, Athens, for appellant.

Richmond M. Flowers, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

The cause was submitted May 6, 1965.

Turner was convicted [1] and sentenced to ten years imprisonment on a jury's verdict of guilty of second degree murder.

The State waived electrocution as punishment and the defendant forewent the right to a special venire. Code 1940, T. 30, § 70. A majority of the panel in Burgess v. State, 256 Ala. 5, 53 So.2d 568 (hn. 8), seems to have approved the practice.

We have taken the following statement of facts from the appellant's brief:

"* * * Saturday * * * June [8], 1964 * * * James Lester Turner, * * * was living with * * * Mae Bell Williams. * * *

"Mae Belle Williams' daughter, Emma Jean [or Imogene] Williams was living with Alvin (Alvie) Lee Hisbon. Emma Jean and Alvie Lee were not married. Emma Jean had five children living with her, some of whom were by Alvie Lee. All were living together in one house * * *

"* * * an argument [arose] * * * between [Turner] and * * * Hisbon * * * on Friday night * * * regarding a light bill * * *.

"* * * Defendant [Turner] left home early Saturday morning, * * * he returned an hour or so before noon * * * Hisbon went to get some whiskey * * * and brought * * * [it] back to the house * * * both [he] and Turner drank of it * * * on the front porch * * *. [This drinking probably was before breakfast.]

"* * * after the whiskey was consumed, Defendant and * * * Hisbon had another argument * * * After this argument, both Defendant and [Hisbon] left the home, for how long does not appear.

"About the noon hour, both Defendant and * * * Hisbon were back * * *. The Defendant had walked out the front door, around the side of the house to a shed where he said he kept a shotgun * * * to go rabbit hunting.

"The State's evidence tends to indicate that the Defendant had threatened * * * Hisbon and went to get the gun to kill [him].

"* * * both [men] were in the back yard * * *; Defendant used [the gun] to shoot * * * Hisbon in the stomach * * *.

"Evidence for the defendant [was that] * * * Hisbon advanced on the Defendant with a large metal garbage pail top in one hand and his other hand reaching in his pocket; that the deceased regularly carried a pocket knife; that the deceased kept advancing upon the Defendant, who told him to stop and it was only then that the shooting took place.

"The State's evidence tends to show that the Defendant had threatened to kill either the deceased or other members of the family a short while before the killing, that he shot and killed Hisbon without provocation; * * *

"* * * the Sheriff [started to testify] as to a purported confession * * *. However, on cross-examination it turned out the [claimed] confession was recorded on tape and when this conversation was played to the jury, it is quite apparent that the Defendant was, as the Sheriff testified, 'under shock' or 'in a condition of shock' and about all he did or said was to *agree* with *all* and *any* statement, suggestion or question that the Sheriff made."

---

1. The indictment was drawn pursuant to suggested Form No. 79, § 259, T. 15, Code 1940, for murder in the first degree.

We take up the defendant's argument point by point.

## I.

The State's first witness, Imogene [or Emma Jean] Williams, a cohabitant with deceased of the premises, testified that when Turner left he said he was coming back and kill some sons of bitches. On cross she testified that no one did anything in reaction to Turner's announcement.

On redirect, the solicitor elicited from her that "some of you all called the law." Defense objected, but it came after the witness had answered.

Later, on further examination by both defense counsel and the judge, it developed that the witness had not heard anyone call "the law," rather that she had called the ambulance. Whereupon, the court, ex mero motu, excluded from the jury's consideration the statement as to the law having been called.

Defense counsel then moved for a mistrial on the ground that, transitory though its reception was, the evidence was yet illegal and "purely to bias this jury." The motion was denied. Correctly so, because (1) the original reception had been brought about by matter first explored by the defense; (2) the court promptly excluded it when shown as actually to be hearsay; and (3) it was harmless.

## II.

Relying on the rule of bringing out all of a conversation where part has been elicited by the other party, on redirect the solicitor asked the sheriff, over objection:

"Just tell the jury what Maxine did tell you."

The sheriff's answer was unresponsive. The court then remarked, "I don't believe I'll let him go into all those details." See Ivory v. State, 237 Ala. 344, 186 So. 460; Southern Cement Co. v. Patterson, 271 Ala. 128, 122 So.2d 386.

Hence, the question objected to analytically was never answered, and the unresponsive matter was withdrawn by the court.

## III.

Defendant requested the following requested charge which the court refused:

"5. The court charges the jury that if the defendant was free from fault in bringing on the difficulty he would be under no duty to retreat unless you believe he could have retreated without increasing his danger or with reasonable safety."

The trial judge in his oral direction covered the substance of this charge.

## IV.

Charge 7 was correctly refused for the same reason.

## V.

Charge 11 refused reads:

"11. The court charges the jury that a reasonable doubt might exist although there is no probability of the defendant's innocence from the testimony; and if the jury do not have an abiding conviction to a moral certainty of the guilt of the defendant, then in that event you shoud acquit the defendant."

We think the recent cases of our Supreme Court hold that variations and shifting emphasis of the different facets of moral philosophy as to the concept of reasonable doubt do not make mandatory that the trial judge duplicate and proliferate the essential idea of the jury's being convinced from the evidence beyond a reasonable doubt and to a moral certainty.

A uniform generalization, i.e., a certainty, in logic, is a rigorous conclusion; e. g., "What goes up must come down."

A statistical generalization, i.e., a probability, in logic, is a comparative conclusion; e. g., "Usually a ball will roll down

hill." But the given premises need not invariably dictate the outcome.

Perhaps, using the laws of chance, a mathematician could point out where a probability descends into a mere possibility. Yet, when we say 100–1 against an assertion, are we saying that an affirmative is probable in one time out of a hundred? Or, can we affirm that 199 negatives will appear before two positives show up?

The Law of Averages is more a conversation piece than a rule of law.

In a tort action (Haskins v. Haskins (1857), 9 Gray (75 Mass.) 390), the trial court instructed "that the burden of proof was on the plaintiff to make out the injury set forth in his declaration; that this burden would be sustained, if upon the whole proof there was a preponderance of evidence, that is to say a balance of the probabilities of the case, in his favor."

The Supreme Judicial Court, per Bigelow, J., reversed, saying:

" * * * The 'weight' or 'preponderance of proof' is a phrase constantly used, the meaning of which is well understood and easily defined. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. But the phrase, 'balance of probabilities,' used by the judge in his instructions as equivalent to the words 'preponderance of proof,' has no well settled or clearly defined meaning. It is at best a vague and indefinite phrase, and would rather lead the jury to infer that they might form their verdict on a guess at the truth, gathered from the evidence, than on a real solid conviction of it, founded on a careful scrutiny and examination of the proof. We cannot sanction an instruction which seems to us to introduce into the practical administration of justice a new phrase of doubtful signification, which tends to cloud the meaning of that which was before clear and well understood, and to confuse and mislead the jury in the discharge of their duty."—Haskins v. Haskins, supra.

In Odom v. State, 253 Ala. 571, 46 So.2d 1 (hn. 8, charge 6), the court applied both Code 1940, T. 7, § 273, fourth sentence [2] and Supreme Court Rule 45. However, Simpson, J., remarked that charge 6 had had uniform approval of appellate courts.

Charge 6 in Odom was couched in the past tense of the modal auxiliary verb, "may," i. e., "might." "May," used to phrase the potential mood of a verb, indicates (1) permission, (2) possibility or doubtful intention, (3) a wish.

"Might," the past form, is idiomatically more usual in subordinate clauses, e. g., indirect discourse, as "I told them that they might go with us." See Kittredge and Farley, Advanced English Grammar.

Here the clause, "that a reasonable doubt *might* exist although there is no probability of the defendant's innocence," is equivalent to, "that there was a possibility of there being a reasonable doubt although there is no probability," etc.

It is noteworthy that Richardson, 33 Ala. App. 40, 29 So.2d 883 (hn. 2, charge 14), cited by Mr. Justice Simpson uses the less abstruse "may." In all the cases cited regarding charge 14 in Richardson, except Knight v. State, 23 Ala.App. 582, 129 So. 478, the form approved has "may."

▇ Procrustean grammatical rules do not limit the oral charge which a trial judge

2. " * * * The refusal of a charge, though a correct statement of the law, shall not be cause for a reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's general charge or in charges given at the request of parties. * * * "

gives. Yet he can be put in error if a given written charge prepared by counsel is by reason of grammatical construction unclear and hence capable of misleading the jury. Contrast Birmingham Railway Light & Power Co. v. Murphy, 2 Ala.App. 588, 56 So. 817, with Empire Life Ins. Co. v. Gee, 171 Ala. 435, 55 So. 166 [N.B. decided before Rule 45 promulgated, 175 Ala. xxi.]

In Standard Cooperage Co. v. Dearman, 204 Ala. 553, 86 So. 537 (hn. 13, charge A), the use of "him" instead of "it" or "them" to denominate a corporate defendant was held sufficient to justify refusal of a requested written charge. See also Louisville & N. R. Co. v. Parker, 223 Ala. 626, 138 So. 231 (hn. 45, charge 56, "even though" ambivalent); Snow v. Allen, 227 Ala. 615, 151 So. 468 (hn. 16, charge B, "and/or" condemned).

We do not consider the use of "might" rather than "may" creates a positively erroneous alternative ("antagonistic") statement of law as was present in Ross v. Ross, 20 Ala. 105. However, we consider the following excerpt from Stokley v. State, 254 Ala. 534, 49 So.2d 284 (hn. 25, charge 3), as eclipsing the cogency of the reference in Odom, supra:

> "This charge has had a rather checkered career in our cases. In the early cases it was held that the refusal of such a charge constituted reversible error. Croft v. State, 95 Ala. 3, 10 So. 517; * * * However, the more recent decisions of this court and of the Court of Appeals hold that the refusal of such a charge is not reversible error, particularly where, as here, the trial court adequately instructed the jury that the defendant must be acquitted unless shown to be guilty beyond a reasonable doubt. * * *"

■ The oral charge and the charges given (covering reasonable doubt, burden, presumption of innocence, etc.) obviated any need for the court to have given charge 11. See Stokley, supra; Whittle v. State,

213 Ala. 301, 104 So. 668; White v. State, 41 Ala.App. 54, 123 So.2d 179 (hn. 9).

## VI.

■ Refused charge 15 is the same as charge 5 refused in Clayton v. State, 23 Ala.App. 150, 123 So. 250, except that in charge 15 of instant concern the witness was not named. Moreover, at p. 135 in the record, the trial judge elaborated on the treatment of the testimony, demeanor, and consistency of the witnesses. The refusal was without error.

## VII.

Refused charge 25 was covered by the oral charge.

## VIII.

Charge 36 refused is confusing.

## IX.

Charge 41 refused was covered by the oral charge and given charges 20 and 25. .

## X.

Charge 43 refused, we think, is based on the misconception that the testimony of Imogene Williams was essential to conviction. See Phillips v. State, 162 Ala. 14, 50 So. 194 (hn. 11).

Maxine Madrey was also an eyewitness to the shooting. Her testimony would support the verdict even if that of Imogene Williams had been excised.

## XI.

Charge 44 refused, we are told, found approval in this court in Rountree v. State, 20 Ala.App. 225, 101 So. 325 (hn. 14, charge 2).

Seemingly, during closing argument the following took place:

> "Mr. Hundley [the Circuit Solicitor] objected to the following statement by Mr. Patton [counsel for defendant]:
>
> "'* * * taken together with these two disreputable witnesses, who, I

think, their evidence can be discredited. * * *'

"MR. HUNDLEY: We object. It's not only improper as evidence, but it is unethical.

"THE COURT: Gentlemen of the jury, a personal opinion an attorney expresses is not binding on you; it is argument. You have the evidence before you. You will make up your own opinions. I'll overrule the objection, and will state to you that you must keep opinions separate from the evidence, and when you do that that will lead you to the proper verdict. Your opinions may concur with that of counsel, but it may not concur, and you are the sole judges as to whether it does or not.

"MR. HUNDLEY: I withdraw the objection."

■ It was an undisputed fact that Imogene Williams was living in sin with the deceased. However, our cases are well nigh uniform that the criterion of character is repute, rather than independent or isolated deeds.

Thus, the attempt to have the jury reason from the particular to the general has been rejected as a device to impeach the credibility of a witness. Smith v. State, 88 Ala. 73, 7 So. 52 (hn. 3); Lowery v. State, 98 Ala. 45, 13 So. 498 (hn. 1); Crawford v. State, 112 Ala. 1, 21 So. 214 (hn. 5); McElroy, Law of Evidence in Alabama (2d Ed.), § 140.01, et seq.

Since no evidence came in of the witness's repute, either of a general nature or for veracity, charge 44 was abstract.

### XII.

In his oral charge the trial judge stated:

" * * * if a person gets on the witness stand, and because of some deliberate effort intends to try to mislead you, corruptly intends to mis-state facts willfully, and willfully makes a misstatement as to a material fact, you have the right to disregard all that witness has said, whether that be for the defendant or for the State. * * *"'

■ Charge 102 refused—though supposedly taken from Register v. State, 34 Ala.App. 505, 42 So.2d 519 (hn. 11, Charge C–22)—is erroneous in form because it would predicate acquittal on the falsity of a material part of a single witness's testimony without regard to the testimony of the other.

Also, the omission of "wilfully" before "false" is an erroneous statement too favorable to the defendant. Pointer v. State, 37 Ala.App. 670, 74 So.2d 615 (hn. 9, charge 1); Higginbotham v. State, 262 Ala. 236, 78 So.2d 637 (hn. 24, charge 14); Powell v. King, 39 Ala.App. 148, 96 So.2d 196 (hn. 1).

The defendant submitted 109 charges to the trial judge. Many of these requests were mere variations one of another. The differences and overlapping required here, as they must have for the trial judge, a tedious, though duty bound, search.

Counsel for the defendant having to budget his time and energies employed the plethora method out of an abundance of caution. We recognize the difficulties occasioned by the present state of only tentative development of approved trial instructions which he encounters.

Since 1945—to use a rough breaking point—the reversals for refusal of charges has dramatically dropped. Part of the background for this has been the abolition of the bill of exceptions with its selected material for appellate review. Now the appellate court has virtually all the trial court's raw material.

Perhaps some group such as our egregious Judicial Conference [4] will initiate considera-

---

4. Act No. 74, Sp.Sess., September 15, 1961, § 5(3), reads: "[It is the duty of the conference] (3) To prepare for presentation to the legislature at each regular biennial session thereof a report of the proceedings of the conference and its

tion of a project resembling the Illinois and California system of approved instructions.

## XIII.

We have carefully reviewed the entire record under Code 1940, T. 15, § 389, and consider the judgment below should be, and it is, therefore,

Affirmed.

recommendations relative to improving the administration of justice in Alabama, and particularly of expediting the business of the courts and utilizing in the most appropriate manner the judges of the circuit courts of the state. The conference shall also recommend such changes

or additions to the rules of practice of the trial and appellate courts of the state as in their judgment are needed. The chief justice shall transmit this report to the legislature at each regular session not later than the tenth legislative day of such session."