266 So.2d 623

**John WILBANKS**

**v.**

**STATE.**

**5 Div. I.**

Court of Criminal Appeals of Alabama.

Jan. 26, 1971.

Rehearing Denied March 2, 1971.

Goodwyn & Smith, Montgomery, Beddow, Embry & Beddow, Birmingham, Geo. P. Howard, Wetumpka, for appellant.

MacDonald Gallion, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

CATES, Judge.

February 9, 1970 this appeal was sent us by the Supreme Court after that court per curiam reversed the judgment of the former Court of Appeals (5th Div. 648, mss. June 25, 1968, 48 Ala.App. 540, 266 So.2d 609):

"We hold, therefore, that the Court of Appeals erred in holding that the trial court erred in refusing the request of counsel for the defendant to interrupt the direct examination of the witness Holley in order to examine him on 'voir dire.' "

We shall take up the other claims of error and also review as we must (Code 1940, T. 15, § 389) all rulings of the trial judge which were against the defendant below, including the charges refused. Code 1940, T. 7, § 273.

I

▮ The first claim is that the verdict was against the "preponderance of the great weight of the evidence."

We have read the entire 761 page record and cannot agree to this as a conclusion of law—unless the testimony of the State Toxicologist is legally inadmissible.

II

Secondly, Wilbanks in brief argues:

"Over strenuous objections by the Defendant, witness Rehling was allowed to testify regarding markings made in high powered gun barrels by machine boring tools or instruments in instances where two barrels might have been bored at the same time by the same tool or instrument, (R. p. 366) even though he had admitted previously on cross-examination that he had never seen a high powered gun barrel made; (R 284) that he knew nothing about their manner of being manufactured; (R 284, 285) that this was the first case he had ever investigated where an 8 mm mouser was involved (R 282), and when pressed on cross-examination to name just one case wherein he had made investigations and comparisons of evidence bullets and test bullets wherein a high powered rifle was involved, he stated, 'That is pretty rough to recall. I remember some cases in North Alabama. One I can't name the Defendant, I don't recall.' The Court overruled the objection of the Defendant to the above saying: 'Well, you qualified him as an expert, I think, with reference to firearms. Go ahead, overrule the objection.'

"Apparently the Court was of the opinion that once a witness is qualified generally as an expert on firearms he may testify and give his opinion on any matter involving firearms even in matters with which he has had no experience. And, further, over strenuous objections of the Defendant, this same witness, who could not remember the name of just one case wherein a high powered rifle was involved in which he had made the investigation, was permitted to testify that he had heard of no two rifle barrels in existence leaving the same identical markings on a bullet that was fired from them. This was permitted even though there was no evidence that the bullet removed from the wall bore identical markings as the tested bullets fired from Defendant's gun by witness Rehling. The evidence is that there were many differences. This is clearly shown by Exhibit No. 15A.

"In all cases where opinions, conclusions of witnesses are offered in evidence under the limitations on, and qualifications of, the opinion evidence rule, the witness by whom the testimony is to be given must have sufficient knowledge of the matter and observed the facts sufficiently to be able to form an opinion that can

reasonably be expected to be reliable and trustworthy.

"It is said in 20 Am.Jur. Evidence Sec. 783 '* * * to be competent to testify as an expert witness, one must have acquired such special knowledge of the subject matter about which he is to testify, either by study of the recognized authorities or by practical experience, that he can give the jury assistance and guidance in solving a problem which the jury is not able to solve because their knowledge is inadequate.'

"Dr. Rehling, admittedly, is well known in Alabama to be a very competent person in certain areas but this is not the question. The question here is: has he had enough experience and training to explain to the jury the manufacture of and the boring of the barrel of an 8 mm high powered rifle and to testify that no two would leave the same markings on a bullet. The fact is, he has not. He has never seen one bored—he does not know how they are bored—this is the first case he has ever investigated involving an 8 mm mauser. He could not name just one case where involving a high powered rifle of any type in which he made comparisons of bullets to determine whereby there was a match."

The Kentucky Court of Appeals in Evans v. Commonwealth, 230 Ky. 411, 19 S.W.2d 1091, characterized Col. Goddard as a "skilled" witness, saying:

"Ordinarily a witness is said to testify as an expert when a state of facts, observed by some one else, is hypothetically submitted to the witness, and he is asked, in view of those facts, to state what his opinion is, whereas a man skilled in a particular business, who makes his own observations, and testifies to what he has observed and his conclusions therefrom, is regarded as a skilled witness. He occupies the same position as any other witness, except that it is recognized that within certain lines he possesses a superior knowledge which enables him to understand, as one without such special knowledge could not, what he has observed. Thus, in a litigation about a horse, an experienced horseman, who had seen and examined the horse, would be permitted to state whether he was a saddle horse or a draft horse; would be permitted to state the horse's age, weight, appearance, or, if he had observed such facts, would be permitted to state if the horse was a crib-biter or a cryptorchid, etc. In like manner, a drover would be permitted to say of a bunch of cattle what they would weigh, what age cattle they were, and to say whether they were polled Angus, Herefords, Shorthorns, etc. A dog fancier of experience would be permitted to say whether a dog was a fox hound, a bird dog, or a poodle, etc. An experienced builder could say whether or not a house was well built, what it would cost, the value of the work, etc. An experienced engineer would be permitted to state the weight, power of an engine, and what caused a cylinder to break, etc. An experienced banker would be permitted to say whether a document was genuine or forged; whether a figure had been changed or not, or an erasure made. A civil engineer of experience could say whether a dam was of sufficient strength to hold back a given body of water; could state the cause of the diversion of the waters of a stream; whether or not a fen could be drained, etc. * * *.

"The statement made by this witness of which the defendant is complaining was this: 'I am convinced as a result of this test that the bullet in evidence was fired through the pistol in evidence 376281.' A reading of that answer shows the witness did not state that as a fact, but stated that, from his observation, he was convinced. In other words, he stated that as his opinion. * * *"

In Frazier v. State, 40 Ala.App. 67, 112 So.2d 212, we remarked:

"Some criticism has been voiced as to the liberality which the courts, both trial and

appellate, have accorded the reception of opinion evidence given by the State Toxicologist and his assistants. Yet, essentially, in virtually every case, the step by step research and testing procedure used by these witnesses has been related to the jury along with the assumed data, corollaries, and other matters asserted to be scientifically axiomatic.

"[2] Thus, while perhaps a toxicologist, for example, may not have had the extensive study or intensive training scholastically or experientially in the field of pathology which we might encounter in a specializing pathologist or a doctor of medicine, nevertheless, where the opinion called for is not of the curbstone variety but rather is predicated upon observation or laboratory demonstrations (under proper scientific controls such as those required by Tesney v. State, 77 Ala. 33), necroptic dissection, or upon reading and research, we cannot say the testimony should not go before the jury merely because the witness had not had this or that course in school. Criminal investigation can probably be called a science—and certainly it is at least a parascience—partaking as it does of the employment of scientific methods and knowledge in many fields to show by deduction or empiricism matters of cause and effect which are not within the scope of everyday observation.

"[3] An expert witness is, by definition, any person whose opportunity or means of knowledge in a specialized art or science is to some degree better than that found in the average juror or witness. McElroy, Law of Evidence in Alabama, § 127, pp. 49–50, Letson v. State, 215 Ala. 229, 110 So. 21, Hicks v. State, 247 Ala. 439, 25 So.2d 139 (nurse gave opinion as to fatality of an axe wound), cf. Daniel v. State, 31 Ala.App. 376, 17 So.2d 542.

"[4] Moreover, in addition to the enquiry of the trial judge's passing on the qualifications of the proffered expert, the defendant has at least three safeguards against being railroaded by the testimony of a mountebank or charlatan: (1) he has the right of cross-examination—'thorough and sifting'—Code 1940, T. 7, § 443, and this may extend to imaginary hypotheses to test the witness' 'specific gravity' (George v. State, 240 Ala. 632, 200 So. 602), or by confronting him with standard works (Smarr v. State, 260 Ala. 30, 68 So.2d 6); (2) he may (as Frazier did here) counter with his own expert; and (3) he may request the court to instruct the jury as to the weight, if any, which may be given to the opinion testimony of an expert witness. Fitzhugh v. State, 35 Ala.App. 18, 43 So.2d 831, Pickett v. State, 37 Ala. App. 410, 71 So.2d 102, Duke v. State, 257 Ala. 339, 58 So.2d 764."

■ The above fits this case. We consider there was no abuse of judicial discretion in letting Dr. Rehling testify as to his opinion that marks on bullets are unique even though some of his skill came from book learning rather than from observation in a shop or factory. Self education is not per se inferior: e. g. Thomas Edison.

### III

The third point is argued in Wilbanks's brief as follows:

"During the direct examination of witness Rehling, the State introduced into evidence, over the timely objections of the Defendant, a picture purporting to show the reconstruction of certain fragments of the deceased child's skull. Mr. Glenn Curlee propounded the following question to the witness:

" 'Does the picture accurately portray the scene it intended to portray?'

"Witness Rehling responded as follows:

" 'Yes, it does.'

"Whereupon Mr. Curlee stated:

" 'We offer it (referring to the photograph) into evidence your Honor.'

"Mr. Joe Goodwyn, of Counsel for the Defendant, immediately interposed the following objection:

" 'Now, we don't know what it intended to portray, who intended to portray what scene. We object to that, may it please the Court and move to exclude his answer to that question.' (R. p. 273)

"A lengthy series of exchanges between the State's Counsel and Counsel for the Defendant (R 273–278) immediately preceded the admission of the photograph as State's Exhibit No. 16–A (R 278). The admission of the photograph into evidence and into the hands of the jury was clearly error. The question propounded by Mr. Curlee, and the answer by witness Rehling, in no way established a proper predicate for the admission into evidence of the photograph in question.

"To be admissible, a photograph must be shown by extrinsic evidence (such as but not limited to the testimony of the photographer) to be an accurate and faithful representation of the place, person or object which it purports to portray."

We agree that the "intention" of a photograph is not within the ken of normal, rational men. The use of the verb "intend" advanced by the State in its brief seems to have no evidence in literature for the last 130 years. No unabridged dictionary available to us shows any modern example which would rescue the question from unmeaningness. The proper question (since Rehling took the picture) would have been something like: "Does this photo show what you saw (when you made it)?"

Axiomatically, a photograph must in some way be authenticated in order to become admissible. Anno. 9 A.L.R.2d 899. We consider, however, that the objectionable question was capable of being recast into a non-objectionable form.

That the question was answered before Mr. Goodwyn made the first objection to the question ordinarily would suffice to uphold the ruling of the trial judge. But,

on this assumption, Dr. Rehling's answer then becomes nonsensical, i. e.: "This picture, State's Exhibit 16–A, accurately portrays the scene that same intends to portray."

Further into the record we find that defense counsel adequately pointed out to the trial judge that no other predicate for admissibility had been laid before Dr. Rehling began to describe what *he* intended the picture to portray.

■ In this posture we are caught between the effect of the area in which Circuit Court Rule 33 does not apply and the beginning of the applicability of Supreme Court Rule 45 on harmless error. As Rule 45 is worded, we cannot conclude that the initial ruling of the trial judge was not probably prejudicial to substantial rights of the defendant.

However, subsequently the State advanced testimony which overcame the infirmity of the question. (R. pp. 273–278)

IV

The Supreme Court, seemingly narrowing prior expressions in Vernon v. State, 239 Ala. 593, at 599, 196 So. 96; White v. State, 260 Ala. 328, 70 So.2d 624; Hines v. State, 260 Ala. 668, 72 So.2d 296; Hunter v. State, 38 Ala.App. 351, 83 So.2d 737, has answered Wilbanks's claim of error for denial of a request for voir dire.

V

The fifth claim of error rests on the prosecutor's alluding in argument to Judas Iscariot and C. D. Brooks (an ex-State toxicologist):

" 'Well, let's talk for just a minute about some of the witnesses, these hired witnesses. You know, there is a saying that every man has his price. I believe for Judas Iscariot it was thirty pieces of silver. What was the price of Mr. Brooks? Somewhere between a thousand and fifteen hundred dollars was

his price. What was the price of Mr. Perry? Seven hundred and fifty dollars approximately up to this time. I forgot to ask Mr. Lee what his price was, a man so busy that he waited until the first trial was over before he came forward with his testimony.'"

Foregoing momentarily the impact upon any Christians who may have been on the jury, we find no evidence that witness Lee was put on the stand as an expert nor that he was hired by the defense.

Appellant, not having objected at the moment of utterance, seeks umbrage in the ineradicable prejudice plain error doctrine voiced by Mr. Justice Simpson in Washington v. State, 259 Ala. 104, 65 So. 2d 704:

"On the question of review and the necessity of preserving the point somewhere in the course of the proceedings, Judge Stone long ago in Cross v. State, 68 Ala. 476, 484, in quoting from the Wisconsin case of Brown v. Swineford, 44 Wis. 282, 28 Am.Rep. 582, which case held that it was the duty of the court to interfere when improper remarks of counsel had been made, said: 'We sum up, lest we be misunderstood. There must be objection in the court below, the objection overruled, and an exception reserved.' The only enlargement of this rule is that where the argument is so greatly prejudicial that its harmful effect is viewed as ineradicable, it may be made a ground for a motion for a new trial. Cases, supra; Bell v. State, 227 Ala. 254, 149 So. 687; American Ry. Express Co. v. Reid, 216 Ala. 479, 484, 113 So. 507."

Here the defendant raised the point in his motion for new trial. The quoted argument comes from an affidavit of the court reporter filed contra said motion.

The remarks to afford a meritorious ground for new trial need to be such "that neither rebuke nor retraction can entirely destroy their sinister influence."

In Mosley v. State, 241 Ala. 132, 1 So. 2d 593, we find Judas Iscariot and Benedict Arnold used to show alteration from good to bad. Yet that figure of speech came from the trial judge and exception was taken.

The testimony of witness Lee related to his hearing rifle shots on the night of July 3, 1960 coming from a place far away from where the State's proof tended to put the origin of the fatal bullet. In brief, Wilbanks recites his testimony as:

"Mr. John P. Lee, Jr. of 754 Hillman Ave., Montgomery, Alabama, testified for the Defendant. He owned Lee-Hana Paint Co. in Montgomery and was 41 years of age and owned a cottage on Lake Martin in July of 1960. He had had a cottage up there about 3 years prior to that time. He first heard about the death of Barbara about 10:00 or 11:00 or 12:00 on the morning of July 4th. Mr. Lee knew where the King and Wilbanks cottages were located and his cottage is located northeast of theirs on Castaway Island Proper, about 1/4 of a mile away. Mr. Lee says that on the night of July 3, 1960, he heard high powered rifle shots. He was familiar with the sound of high powered rifle shots having served in the Marine Corps for 3 years in the South Pacific. He heard these shots right after dark on Sunday night. There were 3, 4, or maybe 5 shots within a period of 5 minutes of each other. These shots did not come from the direction of John Wilbanks' cabin but came from directly across the slough from where he was at the time. He can state with certainty that these shots were not coming from the direction of the John Wilbanks cabin. At the time there was something said and done that fixed these shots in his mind. His wife, at the time said, that there were some peculiar firecrackers and he told her they were not firecrackers but a high powered rifle and he remarked that he hoped that whoever

was shooting that thing knew what he was doing because they had some kids on the beach. The next day when he and his wife heard about the death of Barbara King, he remarked to his wife that he knew the difference between a firecracker and a rifle. He later on, with his wife, went back and pointed out and located the direction of and the place from which the sound of those shots came and that on a later occasion, December 16, 1960, he went back up there in the company of George Howard, Attorney for the Defendant, and located the direction and the place from which the sound of the shots came. That, with George Howard, he first went to where he was when he heard the shots and refreshed his memory as to where they came from and then he went over to the place where it sounded like the shots came from and there was a point of land that slightly extended into the water (R 588). There was a cabin there or near there. You could see the King cottage from the place where the shots were sounding; that there was a flat rock right in front of the cabin that was on a B line with the King cabin right through the woods and that you could see the front of the King cottage from that spot and that there was another spot closer to the cabin by a tree from which you could see the front of the King cottage."

■ Although we concede that the District Attorney's remarks were as to Lee unsupported by testimony and prejudicial, we do not consider that precedent allows us to ignore the failure to object at the time of utterance. However, in considering the case from the aspect of cumulation of errors, we reserve this point.

### VI

■ We do consider that error is made to appear in overruling objection to ask-

ing Mrs. Wilbanks as to whether or not she and her husband had stayed away from Barbara King's funeral. Rollings v. State, 160 Ala. 82, 49 So. 329, 332; Browning v. State, 31 Ala.App. 137, 13 So.2d 54; Dyson v. State, 26 Miss. 362.

### VII

We find no error in overruling objection to Dr. Rehling's explaining a photograph, State's Exhibit 16–A. See the references to Exhibits 26–A, 27–A and 28–A in Boulden v. State, 278 Ala. 437, 179 So. 2d 20.

■ Rehling's testimony described his fitting pieces of the girl's skull so as to form part of a circle with a diameter approximating that of a bullet adaptable to Wilbanks's rifle. Since the subject matter was of a synthesis or reconstruction, its admissibility hinged on more than mere verification.

### VIII

Although we did not take up Wilbanks's seventh point as to Sheriff Holley's getting Wilbanks's rifle by an unconstitutional seizure, the Supreme Court of Alabama, nevertheless, seems to have volunteered an answer.

### IX

Save for the testimony of Dr. Rehling, particularly his opinions that the bullet found in the wall of King's house was fired by Wilbanks's rifle; from a point immediately behind his house; and blew off the top of Barbara King's skull, the State did not make a prima facie case.

Under this analysis the defense was entitled to have jury charged properly. Wilbanks's counsel tendered in writing the following:

"Defendant's Charge No. 17

"The Court charges the Jury that if a conviction in this case depends on the testimony of a single witness; and if the Jury have a reasonable doubt as to the correctness of the testimony of such witness, they cannot convict the Defendant.

"Refused—Melton, Judge"

The refusal of this was wrong on the principles set out in Washington v. State, 58 Ala. 355; McDaniels v. State, 162 Ala. 25, 50 So. 324; and Slayton v. State, 27 Ala.App. 422, 173 So. 632, all cases where the corroboration of an accomplice hung solely on the testimony of one witness. See also Segars v. State, 86 Ala. 59, 5 So. 558.

### X

Written Charge No. 20 is as follows:

"Defendant's Charge No. 20

"The Court charges the Jury that if, from the testimony, there is a probability of Defendant's innocence, that is a just ground for a reasonable doubt; and, if such probability exists in this case, you cannot convict the Defendant.

"Refused—Melton, Judge"

In Wilson v. State, 243 Ala. 1, 8 So.2d 422, Paragraph 64 supports the giving of such a charge. That paragraph is for that case largely obiter dictum because of the scope of the oral charge. However, since it contains dicta propter aliud examen it is binding on this court.

In *Wilson*, supra, refused Charge 45 read:

" '45. The Court charges the jury that if, from the testimony, there is probability of defendant's innocence, that is a just ground for a reasonable doubt; and, if such probability exists in this case, you cannot convict the defendant.' "

As we construe Paragraph 64 of the *Wilson* opinion, the propriety of this instruction hangs upon whether or not (1) it is predicated on the evidence in the case and (2) it, as must all requests, is not pleonastic vis a vis the other instructions.

Here we find no other language that "the jury should acquit if there is from the evidence a probability of innocence." Hence, the trial judge erred in refusing Charge No. 20. Davis v. State, 7 Ala.App. 122, 61 So. 483 (Charge 4).

### XI

At three adjournments of the court over night the record shows the jury was allowed to separate. Circuit Court Rule No. 14 reads:

"No private agreement or consent between the parties or their attorneys, relating to the proceedings in any cause, shall be alleged or suggested by either against the other, unless the same be in writing, and signed by the party to be bound thereby." See Burton v. State, 40 Ala.App. 146, 109 So.2d 311.

In Golden v. State, 39 Ala.App. 361, 103 So.2d 52 we held a waiver of the right to a sequestered jury in a noncapital trial was without any presumption of continuous efficacy. No point was made below of this lapse. Therefore, we forego consideration.

### XII

For the errors set out above, the judgment below is reversed and the cause there remanded for new trial.

Reversed and remanded.

ALMON, J., not sitting.