A jury found defendant (appellant) guilty of manslaughter (Code 1975, § 13A-6-3) after a trial on an indictment charging him with murder (Code § 13A-6-2) of David Harris, by shooting him with a pistol. The court sentenced him to imprisonment for ten years.
No issue is raised on appeal as to the sufficiency of the evidence to support the *Page 1329 
verdict, and we find no reasonable basis for such an issue. We limit our summary of the evidence to portions thereof that have some bearing upon the issues presented.
The evidence shows without dispute that about noon, March 21, 1980, the deceased was killed by a bullet from a pistol in the possession of defendant, while the two were in or about the front yard of 1504 — 31st Street Ensley, which was residential property owned by the deceased and his fiancée and which at the time was unoccupied as a residence and was undergoing improvements in anticipation of its future occupancy by the engaged couple.
Some of the work had been done by defendant, a general contractor, particularly some tile work in the bathroom, sheetrocking some walls, putting in a window and placing wallpaper on some walls. They came to an agreement as to the work to be done and the price to be paid therefor but had reached a disagreement as to the quality of the work performed by defendant, particularly as to the tile in the bathroom, which disagreement led to the confrontation that resulted in the death of Mr. Harris. The defendant was contending that he was entitled to be paid as agreed upon, and Mr. Harris was contending that the work was not satisfactory and payment should not then be made.
Mr. Harris had discussed what he considered unsatisfactory workmanship with Leroy Dumas, another contractor. Mr. Harris and Mr. Dumas were together a large part of the morning of the alleged homicide, during which time Mr. Dumas inspected the work that had been performed by defendant and was in the process of planning some additional work on the house. They were together at the house when defendant arrived in a truck about 11:00 or 11:30 A.M. With the defendant were Andrew McCall and a man by the name of Ashley.
Leroy Dumas testified on call of the State and Andrew McCall, as well as the defendant, testified on call of the defendant. They and Ashley, who did not testify, were the only living persons who saw and heard what occurred at or about the house until about a half hour later, when Mr. Harris was killed and was left lying in the front yard pending arrival soon thereafter of law enforcement authorities.
A material part of the testimony of the defendant was as follows:
"Q. All right. Then what occurred, sir?
 "A. We started into the house. And when we started in he [David Harris] went in first and stopped at the hall. And I started down the hall going to the bathroom. The bathroom is at the end of the hall that goes halfway of the house.
 "And I could hear him in behind me telling McCall that if he was with me to leave because I was going to do that.
 "Q. Now, between the time that you talked to him there at the door and going back to the bathroom, did you notice anything on Mr. Harris' person?
 "A. I noticed he had a gun then. But I really wasn't paying that much attention because I wasn't thinking about it.
 "Q. All right. He had a gun. Where did he have the gun?
"A. It was stuck in his belt.
 "Q. All right. When he told McCall to leave, what did you do or say, if anything?
 "A. Well, the harshness that he said it in made me look back at him. And then I said let's go. I went right past both of them and out the door. Mr. Harris followed me and said wait a minute, I want to hold up my half —
"MR. ADAMS: We object, not responsive.
"THE COURT: Sustained.
 "Q. All right. You went out the door. Do you know where Mr. McCall was at this time?
"A. Behind me.
"Q. Did you know where Mr. Ashley was at this time?
"A. On the porch.
". . .
"Q. What did you do, if anything, then? *Page 1330 
 "A. Well, Harris had a gun. So, I took the gun that was in the truck and put it up under my jacket in my belt.
"Q. Did you put it in either one of your pockets?
"A. It wouldn't fit in the pocket.
 "Q. All right. Where was the gun? Where did you put it?
"A. Into my belt up under my jacket.
". . .
"Q. All right. Then what occurred, sir?
 "A. At that time he had walked up to me. And when he got close enough to me he hit me. He hit me with his — He really didn't sound like he was going to hit me when he was talking because he was talking about too many different things.
 "Q. All right. What did he do? That's what I asked you?
 "A. Oh. He hit me with his hand and knocked me back against the car.
 "Q. All right. How far were you away from the car at the time and on the occasion that you struck?
"A. I had just come around the car. About 18 inches.
 "Q. When he hit you and knocked you back to the truck, what occurred then, Mr. Benford?
 "A. Well, he said, `I ought to shoot you right now.' And he hit me and pulled his gun. And by me falling —
 "Q. All right. When he pulled the gun what did he have the gun in?
"A. In that glove, but it stayed in the glove.
 "Q. When he pulled the gun what happened to the glove?
"A. Nothing. It stayed in the glove.
 "Q. All right. What occurred then when he pulled the gun?
 "A. I was falling. And I sort of knocked him off balance, I guess, because he was falling toward me as I was falling back against the car.
"Q. All right. Then what happened?
 "A. I tried to get the gun out and before I could get it completely out it went off. And it almost shot me. It did scrape across my hand. And I caught my balance and he went down on one knee. He had dropped his gun. So, he reached over to get his gun and I clicked back on the gun that I had. And he said don't shoot me anymore."
The parties seem to agree that the testimony of Leroy Dumas as a whole was more favorable to the State and less favorable to defendant than was the testimony of Andrew McCall. Some differences in the testimony of the eyewitnesses are attributable, we think, to the fact that they were not all at the same place on the premises at the same time and were therefore not in a position to be in absolute agreement as to all that occurred.
The evidence as a whole, including the testimony of defendant, justified the submission of the issue of guilt vel non as to each of the three kinds of unlawful homicide, murder, manslaughter and criminally negligent homicide (§ 13A-6-4).
A major contention of appellant is that the trial court erred in overruling defendant's motion for a mistrial. As a preface, appellant sets forth the following portion of the transcript occurring during the direct examination by the State of the fiancée of the deceased:
 "Q. Okay. Did Mr. Harris talk with him on that occasion?
"A. Yes, sir, he did.
 "Q. And then did he say anything to you after the conversation with Mr. Benford?
"A. Yes.
 "MR. BEDDOW: Judge, just a minute, I object to that, may it please the Court.
"THE COURT: What did he say? All right.
 "MR. ADAMS: Judge, I want to show that this statement he made was a threat. He threatened to burn the man's house down, . . ."
Other portions of the transcript show that the conversation referred to in the portion quoted above was a telephone conversation between defendant and Mr. Harris that occurred early on the morning of Mr. Harris' death and while he and his fiancée were together at a house some distance *Page 1331 
from 1504 — 31st Street, Ensley, which the witness did not hear. Immediately after the quoted portion of the transcript, counsel for defendant interposed an objection to further proceedings in the presence of the jury at the time and the jury was then excused for lunch, somewhat prematurely but conveniently, in order that the parties through their counsel could present to the court their respective positions as to what the State proposed to show and as to what special prosecutor for the State had just stated. A discussion ensued in which State's counsel took the position that it should be allowed to show by the witness that Mr. Harris told the witness immediately after the conversation between him and defendant that the defendant had "threatened to burn Mr. Harris' house down." During an early part of the discussion, the following occurred:
"MR. BEDDOW: . . .
 "That would be the rankest sort of hearsay. And then counsel, representing the State of Alabama made the declaration before the jury, I want to prove there was a threat and I want to prove that this man burned — threatened to burn Mr. Harris' house down.
 "I think it's highly improper. Number one, it's hearsay. And —
"MR. ADAMS: Judge, I think it —
 "MR. BEDDOW: — Number two, it's a declaration or an offer to prove before the witness something that is irreparable and irretrievable. And we are going to ask for a mistrial."
Thereupon, counsel for the State commenced a reply in part as follows:
 "MR. ADAMS: Judge, first of all I want to address a point, and that is, that that is an exception to the hearsay rule. I can give you the exception in a moment that deals with it."
Thereupon, counsel quoted Gamble, McElroy's Alabama Evidence, § 273.02 (1977) as follows:
 "If it is material to prove that a person at a specified time had been put on notice about a matter, or entertained a specified belief, acted in good or bad faith, had a specified motive to do or not to do an act or to do an act with a specified motive, or was mentally deranged, proof that a statement was made to him prior to the time in question which was reasonably calculated to create, and which is offered for the purpose of showing, notice, belief, good or bad faith, motive or mental derangement is not violative of the Hearsay Rule."
The trial court ruled correctly, we think, as to the admissibility of the proposed evidence by ruling that it was inadmissible and instructing the jury to disregard the pertinent statement made by counsel for the State. Judge McElroy made it clear at § 273.02 that the particular exception to the Hearsay Rule was limited to testimony by a witness as to what another person had said and does not include testimony by a witness as to what another person said that a third person had said.
After advising the parties that it would sustain objections of defendant to the proposed evidence, the court stated that it would inform the jury that the statement of counsel for the State as to the proposed evidence was improper. Upon the return of all the jurors to the box, the court instructed them as follows:
 "THE COURT: Members of the jury, before we adjourned for lunch a motion was made and Mr. Adams made a response to it just before we adjourned. And what the attorneys say is not evidence, as I told you. What Mr. Adams said there to the court, not a question to the witness, was improper. And I'm asking you to disregard that remark and not consider it in your deliberations at the end of this case. Can all of you disregard the remark that was made?
 "I see no hands. I assume that all of you are shaking your heads affirmatively. We will proceed. All right. Mr. Adams."
There was no further allusion in the presence of the jury to the proposed evidence.
Appellant argues strenuously that the statement made by counsel for the State was ineradicably prejudicial and entitled *Page 1332 
him to a mistrial. We do not doubt its prejudicial nature, but we do not think it was ineradicable prejudice. During the argument on the question of the admissibility of the evidence out of the presence of the jury, counsel for the State said:
 "Our point is that he was notified that the man was going to burn his house down, and on the basis of that he armed himself and that he had a right to do so, and that is an exception to the hearsay rule because it shows notice of what was going to happen."
It can be readily seen that State's counsel was not obstinately attempting to get before the jury information that he knew did not constitute admissible evidence. As mistaken as counsel for the State was as to the admissibility of the evidence, the transcript shows that he was endeavoring to let the court know the nature of the evidence that he hoped to introduce in order for the court to make a correct ruling, which the State hoped would be in its favor, as to the proposed evidence. We can understand the position of defendant's counsel to the effect that State's counsel should have known better than to believe that the evidence was admissible, but the transcript does not convince us that such was true. In fact, the transcript convinces us that counsel for the State was sincere in his view as to the question, as was defendant's counsel, even though we feel that State's counsel was wrong and defendant's counsel was right in their respective views.
We recognize that a serious question is presented as to the ineradicability of the prejudice that could have been aroused by the statement of counsel for the State, and most persons in the position of appellant would have a similar view, but any prejudicial matter as a rule seems more prejudicial to the one who is prejudiced than to an outsider, who is appraising it from a nonpartisan standpoint. It can also be correctly said that the State's counsel thought that the evidence would have been more beneficial than would others who were viewing it from a nonpartisan standpoint. The trial court had the opportunity to examine and weigh the question of the extent of the prejudicial nature of the statement, both prospectively and retrospectively, that is, before the verdict of the jury and thereafter, and ruled adversely to defendant on his motion for a mistrial and on his motion for a new trial.
We are convinced that in many respects the defendant made a favorable impression on the jury as to the aggravating provocative conduct of the deceased. By finding defendant guilty of manslaughter, instead of murder as expressly charged in the indictment, the jury evidently concluded that defendant caused "the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself," which is a method of committing manslaughter as provided by § 13A-6-3
(a)(2). It seems that the jury in determining that defendant was guilty of manslaughter instead of murder was actuated by what occurred at 1504 — 31st Street, Ensley, within a period of about thirty minutes, while the defendant and the deceased were somewhere on that property, and was not influenced by anything the defendant might have told the deceased by telephone a few hours before. There is no indication that the jury blamed the deceased in the least for possessing a pistol at the time.
The transcript also shows that the jurors at one time while deliberating were apparently seriously considering the issue whether defendant was guilty of criminally negligent homicide, for they returned to the court room with the question:
 "What is the substantial difference between manslaughter and criminally negligent homicide?"
The court then recharged the jury for two transcript pages on the difference between the two kinds of homicide. Although it did not recite § 13A-6-4 on the subject, the foreman of the jury, State's counsel and counsel for the defendant all expressed satisfaction as to the court's instruction, and the jury then returned for further deliberations. *Page 1333 
Whether a motion for a mistrial should be granted is often dependent upon what is heard and seen by the presiding judge. He is in a better position than an appellate court to make a correct determination of the motion, and the determination thereof is wisely vested in his sound discretion. An appellate court should not rule otherwise unless there has been a clear abuse of discretion. Hallman v. State, 36 Ala. App. 592,61 So.2d 857, cert. denied, 61 So.2d 861 (1952); Ballard v. State,51 Ala. App. 393, 286 So.2d 68, cert. denied, 291 Ala. 772,286 So.2d 72 (1973); Franks v. State, 45 Ala. App. 88, 224 So.2d 924
(1968); Moore v. State, 49 Ala. App. 408, 272 So.2d 615 (1973). We find no abuse of discretion in the action of the trial court in overruling defendant's motion for a mistrial discussed above.
The second issue presented by appellant is thus stated in his brief:
 "WHETHER THE COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL ON GROUNDS OF IMPROPER CONDUCT OF THE STATE PROSECUTORS."
In arguing this issue, appellant refers again to his ground for a mistrial by reason of the statement of counsel for the State in the presence of the jury with regard to his effort to show by a witness that the deceased had told her that defendant had threatened to burn his house down, which issue we have already determined adversely to appellant. Appellant's additional argument as to the asserted "improper conduct of the State prosecutors" is directed to two other occasions on which the court declined to grant defendant's motion for a mistrial. One motion occurred after the State had rested and before the defendant had presented any evidence. As to it, the transcript shows the following:
 "MR. BEDDOW: Number two, the State of Alabama has exhibited before this jury two exhibits that were in brown paper bags. And they were unstapled and pulled out and shown to a witness on the stand before the jury. And they have not made any effort to forge a chain or to properly introduce these two weapons. The jury has seen them and they are not in evidence.
 "And we would respectfully ask for a mistrial on that factor."
The incident referred to by defendant's counsel occurred during the redirect examination of State's witness Leroy Dumas as follows:
 "Q. For the record, I am taking out of the sack, City Case No. G-124368, that I received from Evidence Technician Grady Beardon yesterday afternoon — mark that.
 "(Whereupon, a pistol was then marked State's Exhibit 10 for identification and a glove was marked State's Exhibit 11 for identification.)
 "Q. Mr. Dumas, I will show you State's Exhibit No. 10 and ask you if you recognize that pistol?
"A. Yeah.
"Q. And where have you seen it before?
"A. At the site on the day that Mr. Harris was shot.
 "Q. Is that the pistol you saw in the possession of Benford on the day of the shooting?
"A. I think so. Yes.
"Q. Does it look about the same type?
"A. Yes, about the same type.
"MR. GOMANY: We would offer No. 10, Judge.
 "MR. BEDDOW: I object to it. The chain hasn't been offered.
"THE COURT: All right.
 "Q. Well, I will ask you to look at State's Exhibit No. 11. Do you recognize that?
 "A. I recognize the handle and the top portion of the glove, yes, sir.
"Q. And where have you seen this before?
"A. On the presence of the deceased, Mr. Harris.
 "Q. And was it positioned down in his belt, like so? (Indicating)
"A. Yes.
"MR. GOMANY: Now, we would offer both of them.
"MR. BEDDOW: We object to it. *Page 1334 
"THE COURT: Sustain the objection at this time."
Appellant complains that the State did not thereafter attempt to establish the chain of possession of exhibits 10 and 11 and that the jury saw the items that were never admitted in evidence. We do not disagree with appellant's contention to the effect that the State should have either handled the matter by at least endeavoring to establish the chain of possession or by not exhibiting the items in such a way as to be seen by the jury, but we are not persuaded that the action resulted in any prejudice against the defendant or that there was any abuse of the trial court of the discretion vested in it as to the motion for a mistrial.
The third incident upon which appellant relies for his contention that the conduct of the prosecution was so improper that a mistrial should have been granted occurred during the cross-examination by the State of the witness Sergeant Charles M. Melton. As to it, the transcript shows:
 "Q. Sergeant Melton, did you take a tape recording of Dumas' interrogation when you talked to him about the facts?
"A. Yes, sir.
"Q. And did you give that to me last week?
"A. Yes, sir.
 "Q. Have you had a chance to play it back and review it?
"A. Yes, sir, I have.
 "Q. Does it accurately reflect the wording of the questions that you asked Dumas, the questions and answers that Dumas responded to?
"A. Yes, sir.
 "MR. GOMANY: Judge, we would offer the tape for the jury to hear it at this time through Sergeant Melton, which would be better than the questions propounded to the witness earlier by Mr. Beddow. The tape is much more accurate.
"MR. BEDDOW: I want to make a motion.
"THE COURT: All right, let's go in here."
Thereupon, there was a hearing out of the presence of the jury, in which defendant's counsel complained of what had just taken place and requested a mistrial. The court replied, "I think it was improper," but expressed some concern as to whether defendant's counsel had made an opening for the conduct of State's counsel. Upon the return of the jury to the courtroom, the court said:
 "Members of the jury, just a moment ago when Mr. Gomany asked for a tape to be played, and I want to say that that was improper and for you to disregard that remark and that offer. There are certain things on that tape — Well, the tape should have been heard first, at any rate. And there are certain things on there that the Court might have kept out that would be extraneous, it would be improper and would have nothing to do with this case. It would be prejudicial. So, that was very improper.
 "Can all of you disregard that proffer that was made just a moment ago and not let it prejudice any of the parties in any way? Can you follow the Court's instruction on that point?
"All right. Thank you. Proceed, Mr. Gomany."
Nothing further was said about the matter during the trial. The instructions of the court were sufficient, we think, to remove any prejudice against defendant that could have been caused by the particular conduct of the defendant, and the trial court was not in error in overruling the motion for a mistrial.
The rest of the issues on appeal pertain to the refusal of some charges requested in writing by the defendant. The defendant requested seventy-one written charges. All but six were refused. Appellant now urges that the court erred in the refusal of each of charges 24, 35, 38, 47, 52, 53, 61 and 62.
Charge 24 states:
 "The Court charges the jury that if, from the testimony, there is a probability of defendant's innocence, that is a just ground for a reasonable doubt; and if *Page 1335 
such probability exists in this case, you cannot convict the defendant."
Charge No. 62 states:
 "The Court charges the jury that if there is from the evidence a reasonable probability of defendant's innocence, the jury should acquit the defendant."
Appellant finds some support for these charges in Mitchell v.State, 28 Ala. App. 119, 180 So. 119 (1938); Pate v. State,42 Ala. App. 334, 163 So.2d 645 (1964) and in Blalock v. State, Ala.Cr.App., 369 So.2d 35 (1979). However it has been established in Alabama that it is not reversible error for the court to refuse such a charge if the court in its oral charge comprehensively covers the subject of the necessity for proof of guilt beyond a reasonable doubt to sustain the verdict finding the defendant guilty. Perhaps Judge James Rice of the former Alabama Court of Appeals was one of the first jurists to note the harmlessness in the refusal of such a charge in that circumstance. He concluded that the jury could not possibly find that there was a probability that defendant was innocent, if, as a matter of fact it found that there was no reasonable doubt of his guilt, and that the charge was abstract. The same result has followed in many subsequent cases: Stokley v. State,254 Ala. 534, 49 So.2d 284 (1950); Wilbanks v. State, 289 Ala. 171, 266 So.2d 632 (1972); Turner v. State, 43 Ala. App. 42,179 So.2d 170, 173 (1965); Walker v. State, Ala.Cr.App.,358 So.2d 800, 810 (1978).
Charges 35 and 38 are as follows:
 35. "I charge you, members of the jury, that if the evidence or any part thereof, after consideration of the whole of such evidence, generates a well founded doubt of defendant's guilt, the jury must acquit him."
 28. "I charge you, members of the jury, that if upon a consideration of the evidence or any part thereof such evidence generates a well founded doubt of defendant's guilt, then you must acquit him."
Appellant relies upon Atkins v. State, Ala.Cr.App.,369 So.2d 303 (1979). However, it is clear that in Atkins the reversal was based upon failure of the trial court to charge the jury to the effect that a reasonable doubt or a well founded doubt as to defendant's guilt could be based on "any part" of the evidence. In the instant case, this "any part" of the evidence was covered by a portion of the court's oral charge as follows:
 ". . . And on the other hand, if after a full and fair consideration of all the evidence in the case, a part of the evidence or the lack of the evidence, if you do not have a deep and abiding conviction that the defendant is guilty, then you would not be convinced beyond a reasonable doubt and the defendant should be acquitted."
Charges 35 and 38 use the term "well founded doubt" instead of "reasonable doubt," but appellant concedes that "a well founded doubt is the same as a reasonable doubt," as was held in Creaghv. State, 149 Ala. 8, 43 So. 112 (1907). Charges 35 and 38 were refused without error.
We now consider defendant's refused charge 47:
 "I charge you, members of the jury, that if the evidence for the State consists of the statement of a witness, the truth of which the jury have a reasonable doubt, you cannot find the Defendant guilty."
With admirable candor, appellant puts his finger on the troublesome nature of instructions similar to charge 47, by quoting from Slayton v. State, 27 Ala. App. 422, 173 So. 632,639 (1936), after reversal on other grounds, 234 Ala. 1,173 So. 642 (1936):
 "The charge here under consideration does not come within the influence of the cases of Koch v. State, 115 Ala. 92, 22 So. 471, Boozer v. Jones, 169 Ala. 481, 53 So. 1018, and Love v. State, 218 Ala. 66, 117 So. 400. In those cases, the facts and the charges are entirely different; there, there were other witnesses to the details of the crime; here the conviction of the Defendant depends solely and alone upon the testimony of the witness, Bragg, and if the jury did not believe his testimony beyond a reasonable doubt, he could not *Page 1336 
be convicted and the Defendant was entitled to have the jury so instructed."
In endeavoring to place the instant case within the "one witness" for the prosecution category, appellant states, inter alia, "In the instant proceeding, the State relied upon one witness, Dumas, to prove its case." We are not persuaded that the case is within the "one witness" category. We are not persuaded that the conviction of defendant was dependent upon the testimony of Dumas. We think we have quoted enough of the testimony of defendant to show that even under his own testimony a jury issue was presented as to his guilt of each of the three kinds of homicide, murder, manslaughter and criminally negligent homicide. In Slayton v. State, supra, a valid conviction depended "solely and alone upon the testimony of the witness, Bragg." A similar situation existed in Wilbanksv. State, on remand, 48 Ala. App. 549, 266 So.2d 623 (1971),rev'd, 289 Ala. 171, 266 So.2d 632 (1972), wherein the following refused charge was considered:
 "The Court charges the Jury that if a conviction in this case depends on the testimony of a single witness, and if the Jury have a reasonable doubt as to the correctness of the testimony of such witness, they cannot convict the Defendant."
The Court of Criminal Appeals held that the refusal of the charge was erroneous, but the Supreme Court held that it was "misleading, if not positively erroneous, in using the word `correctness' in alluding to the single witness' testimony. . . ." It is clear that in Wilbanks, a conviction was absolutely dependent upon the testimony of a single witness, for it was stated at 266 So.2d 631:
 "Save for the testimony of Dr. Rehling, particularly his opinions that the bullet found in the wall of King's house was fired by Wilbanks' rifle; from a point immediately behind his house; and blew off the top of Barbara King's skull, the State did not make out a prima facie case."
In addition to the failure of the instant case to come within the "single witness" category, we note that the word "consists" in the charge is imprecise in setting forth the principle asserted by appellant and is misleading. In order for the principle asserted by appellant to be applicable, the State's evidence of guilt must have consisted solely or exclusively of the testimony of the witness.
The court was not in error in refusing defendant's charge 47.
Defendant's requested charges 52 and 53 are as follows:
 No. 52: "I charge you, members of the jury, that if a witness has come upon the stand and testified to a different state of facts here to what said witness testified upon the preliminary trial of the Defendant, you have the right to look to this evidence as evidence tending to impeach said witness who has made such conflicting statements."
 No. 53: "The Court charges the jury that if they find from the evidence that any witness has made contradictory statements as to the material facts in this case, or of any such facts, the jury may look to those contradictory statements in order to determine what credence they will give to the testimony of said witness."
Charge 52 finds some support in Harris v. State, 96 Ala. 24,11 So. 255 (1891) and in Wilkerson v. State, 140 Ala. 165,37 So. 265 (1904), but fault has been found in the charge in its failure to predicate the contrariety between the testimony of the witness on the trial and his testimony on preliminary trial upon a "material" fact or matter. Charge 53 finds support inReynolds v. State, 196 Ala. 586, 72 So. 20 (1916) and Robertsv. State, Ala.Cr.App., 346 So.2d 473 (1977). In Roberts, the court found that a similar charge included "a distinct principle of law" that "was not covered in the Court's oral charge." We think that charge 53 was substantially covered by defendant's given charge No. 46:
 "I charge you, members of the jury, that if any of the State's witnesses have exhibited malice against the Defendant or anger, or have testified contradictory *Page 1337 
statements, and thereby satisfied the Jury that they have not testified truly and are not worthy of belief, and the Jury think their testimony on those accounts should be discarded, they may discard it altogether."
We think that probably given charge 46 is more favorable to defendant than refused No. 53. Somewhat related also are defendant's given charges 49 and 50:
 No. 49: "If any witness testifying has been impeached, then the Jury may disregard his testimony, unless his testimony be corroborated by other witnesses."
 No. 50: "I charge you, members of the jury, that if you believe from the evidence that any witness willfully swore falsely on this trial or a former trial, then you may disregard and give no weight to any portion of the testimony testified to on this trial."
We find no error in the refusal to give either charge 52 or charge 53.
Defendant's refused charge No. 61 states:
 "I charge you, members of the jury, that the burden of proof is upon the State, and it is the duty of the State to show beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis every circumstance necessary to show that the defendant is guilty, before the defendant is required to introduce any evidence in his favor or to explain any circumstances surrounding him, and if there is a reasonable doubt of this Defendant's guilt, then you must acquit the Defendant."
In Fetner v. State, 22 Ala. App. 128, 113 So. 467 (1927) andBall v. State, 51 Ala. App. 270, 284 So.2d 296 (1973), it was held that it was reversible error to refuse such a charge. However, in the instant case refused charge No. 61 was substantially covered by defendant's given charge 32:
 "The Court charges the Jury that a person charged with a felony should not be convicted unless the evidence excludes to a moral certainty every reasonable hypothesis but that of his guilt. No matter how strong may be the circumstances, they do not come to the full measure of proof which the law requires if they can be reasonably reconciled with the theory that the defendant is innocent."
This is especially true when charge 32 is considered together with the court's oral charge, which in general sets forth comprehensively the law as to the requirement of proof beyond a reasonable doubt and to a moral certainty of defendant's guilt before he can be lawfully convicted, particularly the following:
 ". . . And before a conviction can be had the State must satisfy each and every member of the jury of the Defendant's guilt, and unless the State satisfies you of the Defendant's guilt beyond a reasonable doubt and to a moral certainty, then he is entitled to an acquittal."
Appellant has presented with marked ability and resourcefulness some close issues. They were not easy to decide, but we are convinced after a consideration of all of them and after a search of the record as a whole that no error prejudicial to the defendant occurred and that the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur. *Page 1338