LEIGH M. CLARK, Retired Circuit Judge.
Prior to the submission of the appeal in instant case, an appeal by the same appellant in another case (Walker v. State, 6 Div. 168) had been submitted. The results in No. 168 have been an affirmance, January 4,1977; a reversal by the Supreme Court of Alabama on September 23, 1977, and an affirmance after remandment on December 6, 1977.
In No. 168 defendant was charged with possession of heroin, found guilty, and assessed a fine of fifteen hundred dollars to which the court added imprisonment for ten years and one day as additional punishment.
In the case now under review, defendant was convicted under Count Two of an indictment which charged that she
“. . . with intent to injure or defraud, did obtain or attempt to obtain a controlled substance, to-wit: Preludin, which substance contains Phenmetrazine, by fraud, deceit, misrepresentation or subterfuge, or by the use of a false name . . ."
A jury fixed her punishment at a fine of five thousand dollars to which the court added seven years imprisonment in the penitentiary.
Tammie Davis, an employee of Big B Drug Store in Northport, Tuscaloosa County, Alabama, testified that while she was helping the pharmacist on October 4, 1976, *802 defendant gave her a prescription for “Pre-ludin-75 mg.” purportedly signed by Dr. Joe P. Smith, a physician in Eutaw, Alabama. After the prescription was filled, she gave the drug to defendant; she had seen defendant approximately three times previously.
Ron Nunnally, a pharmacist and supervisor at Big B Drug Store, testified that he was familiar with the signature of Dr. Smith, and on October 7, 1976, while filling prescriptions for the week, he noticed that the signature of Dr. Smith was not the one he had seen when working in Eutaw. He notified Larry Massey of the West Alabama Narcotics Squad and gave the particular prescription to Mr. Massey. Mr. Nunnally also testified that Preludin is a Schedule II drug.[1]
Dr. Joe P. Smith testified that he had seen defendant one time in his office in September of 1976 where she sought a prescription. At that time defendant was seated in a room near a desk on which there was a prescription pad. He did not give defendant a prescription; he said the prescription made the basis of Count Two was written on one of his prescription pad forms but was not written or signed by him.
Mr. Tom Roberts, previously employed at Big B Drug Store in Northport, testified that he filled the particular prescription.
Larry Massey, an employee of the Tuscaloosa County Sheriff’s Department assigned to the West Alabama Narcotics Squad, testified that he received a phone call from Big B Drug Store in Northport, Alabama, responded to the call, sent the prescription to the Alabama Bureau of Investigation Department, the I.D. Department, and requested that it be checked for fingerprints.
Edgar Ronald Smith, an employee of the Alabama Bureau of Investigation, testified that he is a latent fingerprint examiner; that he had had considerable experience in fingerprinting. He testified that three latent prints of value were found on the prescription that was otherwise identified as the prescription made the basis of Count Two of the indictment. He said that one latent print on the back side of the prescription was made by the same finger which made the ink impression in the right thumb block of a fingerprint card of Claudia Mae Walker. He further said he had charted twelve points of comparison and had found seventeen more between the latent prints lifted from the prescription and those on the “fingerprint card” of defendant hereinafter discussed.
Defendant denied any and all connection with the prescription purportedly signed by Dr. Smith and filled by Big B Drug Store, according to the testimony of the State. She said that her physician was Dr. William F. Hawkins, a physician in Tuscaloosa County, who had been treating her several years for a weight problem. He had prescribed Preludin-75 monthly to be taken by her daily. He gave her a prescription for a one month supply on October 1, 1976. She took the prescription to the Big B Drug Store in Northport and handed it to Tammie Davis, but Tammie told her that they “did not have any of them.” Defendant said she then left and went to Harco Drug — where the prescription was filled.
Dr. William F. Hawkins corroborated the testimony of defendant in testifying that he had treated her for several years for a weight problem; he had prescribed Prelu-din-75 by prescribing a month’s supply each month. His last prescription for her was October 1, 1976.
We cannot bridge or close the rift between the material testimony of the State and that of defendant. The conflict poses a problem that a jury alone has the legal function to decide. Neither party contends otherwise.
At the outset we are met with a disagreement between the parties as to what has been held thus far in the other case, 6 Div. 168. The importance of the problem is accentuated by the fact that in instant case *803 the “fingerprint card” of defendant, which was used for comparison purposes with the latent fingerprints allegedly lifted from the prescription, was made in October 1975 at the time defendant was arrested for the possession of heroin in 6 Div. 168. During the trial of the case now under review, defendant objected to the use of such “fingerprint card” on the ground that there was no probable cause for her arrest at the time and, in the absence of probable cause for her arrest, the use of a “fingerprint card” processed at the time would constitute a violation of the Fourth Amendment to the Constitution of the United States as enlarged to include prosecutions in state courts by the Fourteenth Amendment to the Constitution of the United States.
We agree with appellee that it has been definitely decided in 6 Div. 168 that there was probable cause for believing that defendant was in possession of heroin at the time, and no warrant was necessary to effectuate a valid and constitutional search of the box that was in her possession and which contained the particular contraband.
Appellant urges that the trial court should have recused himself as the trial judge in the case.
The indictment in this case was returned on November 12, 1976; she was arraigned and pleaded not guilty on December 29, 1976; her case was set for trial on April 12, 1977. On that day defendant filed a MOTION FOR TRIAL JUDGE TO RECUSE HIMSELF. At the time the motion was filed, defendant’s counsel invited the court’s attention to the fact that he had written a letter to the court dated March 24, 1977, as to which he commented, inter alia, “In that letter my client has requested me, that it is her felling (sic) that she would not get a fair and impartial trial as you are the Judge in this case. Since you did prosecute her over a year ago, and I ask you on behalf of my client, she remembers you in that case. And since you did prosecute her in that case, she feels that she could not get a fair and impartial trial, that was in the letter which was sent to you a good while ago, which you are the subject. And I make this request to you on the behalf of my defendant in this case in which she is charged with forgery of prescription to contain a controlled substance by fraud, and also which she is charged with the obtaining of a controlled substance by fraud.” Out of the presence and hearing of the jury, the court proceeded to hear defendant on the subject, including the testimony of defendant and her attorney.
We search the record with difficulty in an effort to find any specific charge of disqualification of the trial judge. The closest thereto is to be found in the following:
“3. That your Honor, Judge Claude Harris, before becoming a Circuit Judge, was an Assistant District Attorney of Tuscaloosa County, Alabama; that while an Assistant District Attorney, Judge Harris prosecuted your Movant in a case charging possession of heroin, and secured a conviction which is now on appeal and pending in the Supreme Court of Alabama; that in said case, due to the insis-tance of Judge Harris, Movant was given ten (10) years and One (1) day by the then presiding judge, which prevented her from being considered for probation, even though this was her first offense of this nature.
“4. That during the trial of said prior cause, Judge Harris adopted a strong adversary stance and prosecuted your Mov-ant very vigorously.
“Further, Judge Harris made statements about Movant’s father and friends participating in narcotics traffic in this county, which Movant alleges demonstrates prejudice and bias against her by Judge Harris that is so deep and uncompromising that it would be improper for him to impartially preside as Trial Judge in the case pending before him.”
At times during the hearing on the motion to recuse, the inquiry was raised as to whether Judge Harris had participated in any way in the prosecution of the case now under review, but the evidence was conclusive that he did not. Judge Harris had left the office of District Attorney on January 31, 1976, approximately eight months be *804 fore the incident giving rise to the case now before us. Although there were oblique references to “prejudice and bias against her by Judge Harris,” there is no evidence whatever to support any such claim. In as favorable a light to appellant as possible the hearing disclosed merely that Judge Harris, while Assistant District Attorney, prosecuted appellant for another drug related charge, that he did so vigorously, as he should have done, and that his efforts were successful, which certainly is not to his discredit.
The Canons of Judicial Ethics adopted February 1, 1976, by the Supreme Court of Alabama provide in pertinent part:
“CANON 3C DISQUALIFICATION:
“(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
“(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings;
“(b) he served as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer in the matter, or the judge or such lawyer had been a material witness concerning it.”
Code of Alabama 1975, § 12-1-12 provides:
“No judge of any court shall sit in any case or proceeding in which he is interested or related to any party within the fourth degree of consanguinity or affinity or in which he has been of counsel or in which is called in question the validity of any judgment or judicial proceeding in which he was of counsel or the validity or construction of any instrument or paper prepared or signed by him as counsel or attorney, without the consent of the parties entered of record or put in writing if the court is not of record.”
Statutory grounds or rules of court are not exclusive of the common law principles that disqualify a judge. Morgan County Comm’n v. Powell, 292 Ala. 300, 293 So.2d 830 (1974). Even so, there must be factual disqualification, as distinguished from the notions of a particular litigant, that he would fare better before another judge.
Appellant argues that during the trial of this case there was “called in question the validity of any judgment or judicial proceeding in which [Judge Harris] was of counsel,” which is a stated ground of disqualification in Code of Alabama 1975, § 12-1-12. The reference is to a certificate of judgment of conviction in Walker v. State, 6 Div. 168, the case in which defendant was convicted of possessing heroin. It is correct that defendant objected to the introduction in evidence of such certificate of judgment, but defendant did not question the validity of the judgment. The grounds of objection were of an entirely different nature which will be referred to in our discussion of another point made by appellant. Peaden v. State, 284 Ala. 341, 224 So.2d 889 (1969), cited by appellant, is inapposite. In Peaden, there was a direct attack on the judgment brought by a petition for writ of error coram nobis. The judgment thus attacked was in a case in which the then defendant was represented by the judge who was held disqualified to try the coram nobis petition. The quoted provision of the statute is without application to a judgment unless the “validity” thereof “is called in question.”
The only other case cited by appellant in which it was held that the trial judge should have recused himself is Ex parte White, 53 Ala.App. 377, 300 So.2d 420, cert. denied 293 Ala. 778, 300 So.2d 439 (1974). The facts in White are antipodal to those here. Wholly lacking in this case is the kind of bias or prejudice that furnished the basis for the disqualification of the trial judge in White:
“The bias or prejudice which will disqualify must be ‘personal’ as distinguished from ‘judicial’ bias. ‘Personal,’ as contrasted with ‘judicial,’ characterizes an attitude of extra-judicial origin, derived non coram judice. Craven v. United *805 States, 1 Cir., 22 F.2d 605.” Ex parte White, 300 So.2d 420, 430.
During the cross-examination of defendant, she was asked whether the handwriting on the prescription calling for the prelu-din was hers, and she replied that it was not. She was then asked if it was the handwriting of Jimmy Lavender, and she replied that it was not. The evidence had developed that Jimmy Lavender is the father of two of appellant’s children. During further cross-examination of defendant the following occurred:
“Q Ms. Walker, I believe you testified that you didn’t know anything about this drug Preludin, except what the doctor told you about.
“A Right.
“Q You are not familiar with drugs, then?
“A No.
“Q You don’t know anything about them?
“A I have never been charged with drugs.
“Q You have never been charged with drugs?
“A I have never been charged with drugs—
“Q Isn’t it a fact, Ms. Walker, that after—
“MR. NICHOLS: Judge, may we — may we at least get this settled down before we go forward with this?
“(At this time a short conference was held at the judge’s bench where the proceedings were as follows between the attorneys and the court.)
“MR. NICHOLS: I know what he’s going at, are you going to let it come in?
“MR. ROYER: Well, Judge, we have got ■to go into it.
“MR. NICHOLS: No, he doesn’t.
“THE COURT: I think he does, I am sorry, but it’s your witness’ cross-examination.
“MR. NICHOLS: You, are you going to let the judgment go in?
“THE COURT: That’s right.
“MR. ROYER: She’s testified that she doesn’t know anything about drugs, that she’s never been charged with drugs.
“MR. NICHOLS: We object to it, you know you are going to be reversed on that, you know that.
“THE COURT: Overruled.
“Q You say you have never been charged with drugs, any drug offenses, you have just testified to that?
“A Yes.
“MR. NICHOLS: She didn’t say that, drugs, that could be anything.
“Q Is it not a fact, Mrs. Walker, that you have been convicted in this Circuit Court of Tuscaloosa County of the offense of possession of heroin?
“MR. NICHOLS: All right, now, Your Honor has already overruled my objection I made up at the bench. I told you that is what he was going to ask, I take the position that it is highly prejudicial, and illegal.
“THE COURT: All right, sir, overruled.
“MR. NICHOLS: You have overruled me, and I move for a mistrial.
“THE COURT: All right, I overrule the motion for a mistrial.
“MR. NICHOLS: We except.
“THE COURT: All right, sir.
“(At this time a document was marked for identification as State’s Exhibit 4)
“MR. ROYER: At this time, Your Honor, we would move to introduce this exhibit in the evidence, a copy of the judgment entry, in the case of the State of Alabama v. Claudie Mae Walker, showing the conviction for the possession of heroin, in the Circuit Court of Tuscaloosa County on the 19th of January, 1976.
“MR. NICHOLS: I object to it, Your Honor.
“THE COURT: All right, it will be admitted.”
Appellant strongly insists that the trial court was in error in permitting the introduction of the judgment.
Seemingly there is no disagreement between parties as to the general rule that the commission of other crimes by de *806 fendant is not admissible against him subject to a number of exceptions. Appellee relies upon Vincent v. State, 231 Ala. 657, 165 So. 844, cert. denied 298 U.S. 682, 56 S.Ct. 960, 80 L.Ed. 1402 (1936) and Calhoun v. State, Ala.Cr.App., 346 So.2d 39 (1977). In Vincent, it was held that the State was justified in showing that one of the defendants had previously been convicted of robbery to refute a statement by defendant that “I have never taken part in any holdup or robbery before.” In Calhoun, defendant had stated that he had never been in trouble with the law before, and the State was allowed to refute such statement by showing a prior conviction for robbery. Appellant argues that in each of the cases the statement made by defendant was during “direct” examination and that a different result should be reached where the statement of defendant sought to be refuted by the State was brought out on cross-examination of defendant. Neither party cites any authority definitely holding that the sole criterion is whether the evidence was brought out on direct examination by defendant on the one hand or on cross-examination by the State on the other.
“. . . The State cannot make its own setting for the justification of illegal evidence, so as to permit the contradiction of what it brought out, though on cross-examination of witnesses for defendant.” Dickinson v. State, 228 Ala. 28, 29, 152 So. 29, 30 (1934)
We think the parties have unduly limited the scope of the particular inquiry. There is more involved than the question, “Who opened the door?”
That there is only a small area for admitting evidence of other crimes has been repeatedly refuted.
“Of course the general rule is that other offenses unconnected with the crime charged are incompetent and irrelevant. But there are many exceptions to this general rule. 22 Corpus Juris Secundum 1089, Criminal Law, § 683; Glover v. State, 21 Ala.App. 423, 109 So. 125; Dennison v. State, 17 Ala.App. 674, 88 So. 211; Mitchell v. State, 140 Ala. 118, 37 So. 76, 103 Am.St.Rep. 17; Jackson v. State, 229 Ala. 48, 155 So. 581.
“Evidence which is relevant to establish some element of the offense, or material as to some issue in the case, is not rendered inadmissible by the fact that it also tends to show another offense committed by defendant. 22 Corpus Juris Secundum 1116, Criminal Law, § 691, note 31; 20 Amer.Jur. 290, section 311; Wilkins v. State, 29 Ala.App. 349, 197 So. 75, certiorari denied 240 Ala. 52, 197 So. 81. This includes the right to introduce evidence to controvert a material aspect of defendant’s evidence. .
“It is pointed out in Wilkins v. State, supra, that as stated in Wharton’s Criminal Evidence, an exception to the rule of exclusion is where the state’s evidence is (8) relevant to rebut special defenses. “In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it.” Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942)
The comprehensiveness of the area of admissibility is further emphasized as follows:
“This rule, however, is subject to some well recognized exceptions. Evidence of other distinct criminal acts is admissible when relevant to the crime charged, as bearing on scienter, intent, motive, res gestae, or to establish the identity of the accused (and perhaps as bearing on the issue of insanity when that defense is pleaded in the ease. — See ‘The Law of Evidence in Alabama’ by Honorable J. Russell McElroy, § 61, pp. 19-20; I Wharton’s ‘Criminal Evidence,’ 10th Ed., p. 156, § 41.) The authorities also recognize such an exception to show system or plan usually to identify the accused or to show *807 intent. Wharton’s, supra, p. 146, § 39. But even under the exceptions noted they or one of them is admissible only when the evidence is relevant to the crime charged. Noble v. State, 253 Ala. 519, 45 So.2d 857.” Garner v. State, 269 Ala. 531, 114 So.2d 385 (1959)
The nature of the charge, that is, the nature and the ramifications of the issues between the parties, must of necessity have tremendous bearing upon the question whether evidence of other crimes is admissible. It is to be noted that in this case counsel for each of the parties was a skillful participant on behalf of his client.
According to that which has been definitely determined in Walker v. State, 6 Div. 168, scienter is an essential element of the crime charged. Although the indictment charged an attempt to obtain or obtaining a controlled substance by fraud, there could have been no guilt on the part of defendant if she did not have scienter, guilty knowledge, of the substance she is alleged to have obtained or attempted to obtain. That scienter was necessary was obviously known to defendant’s counsel, as shown by his direct examination of her as a witness. Among the first questions asked her were some as to her age and her schooling. She was twenty-seven years of age and had gone through the seventh grade. He asked for her weight and she replied that she weighed 220 pounds and was five feet three inches tall, that she had been trying to control her weight and had been seeing Dr. Hawkins concerning her weight. He asked her about Dr. Hawkins’ previous treatment of her as a physician, and she replied that he had delivered her two children and was her family doctor and had “done surgery on me, and tied my tubes, and that is when he told me that I was fat, that I needed to lose weight.” She said this was in May of 1976. The following is part of the direct examination:
“Q Claudia Mae, do you remember going to see Dr. Hawkins on October 1, 1976?
“A Yes, sir.
“Q What occurred when you went to see him, were you examined by him, see him in his office?
“A Yes, sir.
“Q Did he give you a prescription for— “A Yes, he did.
“Q For a drug that you had been taking. Do you know what you had been taking, Claudia Mae, did you know what Dr. Hawkins had given you, your medication, for your diet, for your weight?
“A He explained it to me. No, I didn’t.
“Q You did not know what he was giving you, but he explained it to you.
“A Explained it to me, how to take it, he told me ‘Don’t go too fast with it, don’t lose weight too fast, ’cause it makes you sick.
“Q He just prescribed some medicine, as doctors often do, to a million other people, whatever you go see him for.
“A Right. Yes, sir.
“Q What did you do with that prescription that he gave you on October 1, Claudia Mae?
“A About 12:00 I went to—
“Q 12:00 in—
“A In the evening.
“Q Is this right, 12:00 Noon?
“A Yes, sir. I went—
“Q That afternoon.
“A I was going home, I went to Big B Drug and handed it to the lady, that testified that she seen me, give her this scrip over—
“Q When you say, ‘scrip,’ you are not, that’s when we discuss it that’s your way of saying prescription, is that right?
“A Yes, sir.
“Q All right, now go ahead and tell the jury what you remember on Friday of October 1, 1976.
“A I give her the prescription, and she told me that they did not have any of them, I told her thank you, I left, I went to Harco Drug, and they filled it.
“Q Harco Drug filled this prescription, that Dr. Hawkins gave you?
“A Yes, sir.
“Q All right. You, and this was on Friday, October 1?
*808 “A Yes, sir.
“Q Did you know it was for preludin?
“A Yes, that is what he told me it was.
“Q Who told you?
“A Dr. Hawkins.
“Q And you got it filled at Harco?
“A Yes, sir.
“Q Is that the one over in south — what is it Northgate?
“A Northgate.
“Q Northgate over in Northport?
“A Right.
[[Image here]]
“Q Where do you generally get those prescriptions of Dr. Hawkins filled?
“A I usually stop at Harco or Big B.
“Q Or Big B?
“A Uh huh. (Yes.)
“Q You use them both.
“A Yes,- sir.
“Q On October 4, 1976, did you get any preludin, controlled substance, phenme-trazine, or anything of that type from Big B Drug?
“A No, sir. I did not.
“Q Thank you.
“MR. NICHOLS: That’s all.”
Appellant’s counsel had the right to portray defendant in the most favorable light honestly possible, which he was obviously attempting to do. A jury could have believed from her testimony that she was a victim of inexplicable circumstances as to the prescription; that she had been taking a controlled substance, without the benefit of a prescription, but that she honestly did not know that it was anything more than a diet pill that the doctor had prescribed by name. Counsel was obviously attempting, as he had the right to do, to show that defendant was so naive as to be unaware of the fact that she was procuring or attempting to procure a controlled substance. On the other hand, the State had the right to show, if it could, that she was not a pawn in the hands of another, that she was familiar with drugs, legally controlled substances, particularly a well-known controlled substance, such as heroin.
In Coshatt v. State, 37 Ala.App. 422, 69 So.2d 877 (1954) defendant was convicted of illegal possession of narcotic drugs. The evidence for the State tended to show that a detective went to a store and was introduced by the operator to appellant. The appellant then told the detective he had the “stuff” with him and produced a cardboard box containing a rather large number of bottles. After examining each bottle and discussing the price, the detective told the appellant he would have to go into Bessemer to get the money, and the two then started to drive to Bessemer in an automobile taking the box of bottles with them.
It was stated therein:
“Other evidence introduced by the State tended to show that the bottles produced by the appellant contained various types of narcotic drugs which were derivatives or compounds of opium or morphine. It was also shown that these drugs were the same that were stolen from a drug store in Birmingham, the pharmacist in the drug store identifying the bottles by a cross mark she had written on each bottle label.
“The pharmacist also testified as to the narcotic qualities of the drugs in the various bottles.
“The evidence that the bottles of drugs were the same as those stolen from the drug store was properly received in evidence, even though it might tend to show the commission of an offense not charged in the indictment.
“This evidence shed light on whether the appellant had lawfully acquired possession of the drugs within the provisions of our narcotic law, a material issue in this prosecution. It was therefore relevant and admissible in this aspect. Snead v. State, 243 Ala. 23, 8 So.2d 269.” Coshatt v. State, 37 Ala.App. 422, 69 So.2d 877 (1954)
It should be noted that possession of a controlled substance by an “ultimate user or person in possession of a controlled substance pursuant to a lawful order of a practitioner does not constitute a violation of the Controlled Substances Act.” Code of *809 Ala. 1975, § 20-2-51(c)(3). That the less knowledgeable, the less sophisticated, one is as to drugs, the less the likelihood of the existence as to him of the essential element of guilty knowledge, is emphasized by the fact that there are over one hundred controlled substances listed under various provisions of the Controlled Substances Act. Code of Ala. 1975, § 20-2-1 — 20-2-93.
Appellant’s requested charges 4, 9 and 14, have their chief, if not their only, value to defendant in their setting forth the principle that defendant is presumed innocent and cannot be convicted unless the evidence convinces the jury of his guilt beyond a reasonable doubt. The oral charge is replete with references to the requirement of proof of guilt beyond a reasonable doubt and as to a moral certainty, and the court gave three instructions requested in writing by defendant on the subject. Everything of any benefit to defendant in charges 4, 9 and 14 was fully covered in the court’s oral charge as well as in one or more of the charges given at the request of defendant.
Refused charges 7, 10 and 18 set forth the principle that a valid verdict cannot be rendered unless it represents the unanimous view of the jury. This principle was adequately covered in more than one instance in the court’s oral charge.
Defendant’s refused charges 19 and 20 were as follows:
“19. I charge you, members of the jury, that the action of the grand jury in finding the indictment is not evidence of the guilt of the Defendant and should not be considered by the jury in this case.
“20. The court charges the jury that the indictment in this case is not any evidence in the case, and the fact that Defendant had been indicted is not to be considered by you as a circumstance against her, but said indictment is merely the method of placing Defendant on her trial, but the presumption of innocence attends the Defendant throughout this trial, and remains with her and authorizes an acquittal, if the entire testimony fails to overcome said presumption by proof of the Defendant’s guilt beyond a reasonable doubt.”
During its oral charge, the court said: “Now, how did this case get into this Court? It got into Court by way of the means of an indictment. And as I told you earlier, an indictment is not evidence, and it is not to be construed by you as evidence. It is merely the manner or vehicle by which this case gets into this Court.
[[Image here]]
“Now, as I told you from the outset, it is your duty to base your verdict on the evidence in this case. Now, evidence to be considered by you is one, that is the evidence from the witnesses, from the witness stand, and also evidence to be considered by you are the exhibits, which you may take into the jury room with you for your consideration and any presumption of law not refuted by the evidence. And evidence, as I told you, is that the defendant is presumed innocent, and this presumption of innocence attends her throughout the trial and even into the jury room until you, the jury, remove this cloak of innocence from her. Evidence is not anything in the indictment, and as I have told you, it is not evidence. Evidence is not the arguing of the attorneys, and evidence is not rulings of the Court. They are not to be considered by you in any way as evidence.”
Defendant received in the court’s oral charge as much as defendant requested in refused charges 19 and 20 relative to the effect of the indictment. The refusal of both charges was justified.
Defendant’s requested charge No. 29 provides:
“The court charges the jury that they have a right to disregard the testimony of the finger print expert who testified in this case if the jury finds that he is not fully qualified as an expert.”
Appellant cites Wilson v. State, 243 Ala. 1, 8 So.2d 422 (1942) in support of his assertion that there was error in refusing the partic *810 ular charge. Wilson holds to the contrary as to several similar charges relative to the testimony of expert witnesses.
“Charges 19 to 28, inclusive, were properly refused as containing misleading tendencies in respect to testimony of expert witnesses given the jury in the oral charge of the court. Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524; United States v. Goodloe et al., 204 Ala. 484, 86 So. 546. While the jury is not concluded by the opinion given by experts, it is the province of such triers of fact to measure the weight and correctness of opinions given by experts. Braham v. State, 143 Ala. 28, 38 So. 919.” Wilson v. State, 243 Ala. 1, 19, 8 So.2d 422, 438 (1942)
The court refused defendant’s requested charge 44 as follows:
“The court charges the jury that, if after considering all the evidence in the case, that tending to show guilt, together with tending to show innocence, there should spring up involuntarily in the minds of the jury from any part of the evidence a probability of the innocence of the defendant, the jury cannot convict her.”
In Wilson v. State, 243 Ala. 1, 8 So.2d 422 (1942), it was held that such a charge stated a correct proposition of law. In Smiley v. State, 53 Ala.App. 268, 299 So.2d 312 (1974) we took especial note of the fact that the charge had “been held bad in several cases” but that it had been held good in others.
Charges that seek to base a not guilty verdict on the existence of the “probability” of defendant’s innocence have been troublesome throughout the years, and we find that in general there has not been uniformity in the conclusions as to whether it was reversible error to refuse such charges. The status at the time was well expressed by Justice Lawson in Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950) as follows:
“This charge has had a rather checkered career in our cases. In the early cases it was held that the refusal of such a charge constituted reversible error. Croft v. State, 95 Ala. 3, 10 So. 517; Whitaker v. State, 106 Ala. 30, 17 So. 456; Morris v. State, 146 Ala. 66, 41 So. 274. However, the more recent decisions of this court and of the Court of Appeals hold that the refusal of such a charge is not reversible error, particularly where, as here, the trial court adequately instructed the jury that the defendant must be acquitted unless shown to be guilty beyond a reasonable doubt. Edwards v. State, 205 Ala. 160, 87 So. 179; Russo v. State, 236 Ala. 155, 181 So. 502; Wilson v. State, 243 Ala. 1, 8 So.2d 422; Napier v. State, 26 Ala.App. 597, 164 So. 307; Reeves v. State, 28 Ala.App. 222, 182 So. 90; Duncan v. State, 31 Ala.App. 186, 13 So.2d 695. To like effect see Odom v. State, 253 Ala. 571, 46 So.2d 1.”
The quotation from Stokley was expressed approved in Wilbanks v. State, 289 Ala. 171, 266 So.2d 632, on remand, 48 Ala.App. 754, 266 So.2d 637, cert. denied, 409 U.S. 1116, 92 S.Ct. 913, 34 L.Ed.2d 700.
Speaking to the subject of the confusion that had been wrought by the use of the expression of “probability of innocence” or “improbability of guilt,” Judge Cates in Turner v. State, 43 Ala.App. 42, 179 So.2d 170, 173, said:
“We think the recent cases of our Supreme Court hold that variations and shifting emphasis of the different facets of moral philosophy as to the concept of reasonable doubt do not make mandatory that the trial judge duplicate and proliferate the essential idea of the jury’s being convinced from the evidence beyond a reasonable doubt and to a moral certainty.
“A uniform generalization, i. e., a certainty, in logic, is a rigorous conclusion; e. g., ‘What goes up must come down.’
“A statistical generalization, i. e., a probability, in logic, is a comparative conclusion; e. g., ‘Usually a ball will roll down hill.’ But the given premises need not invariably dictate the outcome.
“Perhaps, using the laws of chance, a mathematician could point out where a probability descends into a mere possibility. Yet, when we say 100-1 against an assertion, are we saying that an affirma *811 tive is probable in one time out of a hundred? Or, can we affirm that 199 negatives will appear before two positives show up?
“The Law of Averages is more a conversation piece than a rule of law.”
We take it that the state of the law now is, and logically should be, that there can be error at times in the failure of the court to' give a requested charge to the effect that there can be no conviction if in the minds of the jury there exists the view based on the evidence that defendant is “probably” not guilty, but that reversible error cannot be predicated upon the refusal of such a charge if the trial court had adequately charged the jury on the necessity for proof of defendant’s guilt beyond a reasonable doubt.
As we have already indicated, the trial court more than adequately instructed the jury as to the necessity for proof of defendant’s guilt beyond a reasonable doubt and to a moral certainty. The trial court was not in error in refusing charge 44.
In addition to the extraordinary amplitude of the court’s instructions as to the burden that was on the State, the presumption of defendant’s innocence, the necessity for proof that would convince the jury of her guilt beyond a reasonable doubt and to a moral certainty, we find that the court actually gave one charge requested by defendant in which the necessity for the negation of “probability of her innocence” was definitely stated. We refer to defendant’s given charge No. 8 as follows:
“The court charges the jury that the only just foundation for a verdict of guilty in this case is that the entire jury shall believe from the evidence, beyond a reasonable doubt and to a moral certainty, that the Defendant is guilty as charged in the indictment to the exclusion of every other probability of her innocence, and to every reasonable doubt as to her guilt, and if the testimony in this case has failed to furnish the aforesaid measure of proof and to impress the minds of the jury of such proof of the Defendant's guilt, then the jury should find the Defendant not guilty.”
A defendant is entitled to definite instructions requiring proof sufficient to convince the jury beyond a reasonable doubt of defendant’s guilt, and a court is in error in refusing to definitely instruct the jury accordingly, but this principle does not require the court to accept any and all phrases proposed by defendant that would at the best be no more favorable to defendant than the use of the traditional expression of “beyond a reasonable doubt and to a moral certainty.” The expression “beyond a reasonable doubt” has stood the acid test of time without criticism and confusion. Substitutions therefor have demonstratively led to confusion and division of opinion.
Defendant’s requested charge 6 is almost identical with charge (3) in Jackson v. State, 193 Ala. 36, 69 So. 130 (1915), as to which it was said:
“Charges like those refused to appellant, and marked by us in the margin of the transcript as 2 and 3, have been repeatedly condemned. 7 Mayf. Dig. p. 138, sub. ‘Reasonable Doubt.’ ”
We have attempted to consider fully all questions raised by appellant in her brief and have searched the record for error prejudicial to defendant and have found none.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article, Constitution Amendment No. 328. His opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.

. It is likewise scheduled in other parts of the record. According to Code of Ala.1975, § 20-2-27, Phenmetrazine is a Schedule III controlled substance. This discrepancy, however, seems immaterial to any question in this case.